COLONNADE CONDOMINIUM, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 323-83.          Filed October 20, 1988.

---

794

*George A. Simpson* and *George J. Rabil,* for the petitioner.

*Cynthia J. Mattson,* for the respondent.

WRIGHT, *Judge:* Respondent determined the following deficiencies in petitioner's corporate income tax:[1]

| TYE Jan. 31— | Deficiency |
|---|---|
| 1978 | $81,991.29 |
| 1979 | 421,914.35 |
| 1980 | 4,983.45 |

In the statutory notice of deficiency, respondent determined that petitioner distributed a partnership interest to its shareholders resulting in a gain taxable to petitioner under section 311(c).[2] On January 18, 1985, respondent filed a motion for leave to file amendment to answer wherein he

---

[1] In his notice of deficiency dated Oct. 8, 1982, respondent also determined an overassessment in the amount of $7,737.70 for petitioner's 1981 taxable year. Although petitioner placed taxable year 1981 in issue in its petition, at trial petitioner orally moved to dismiss that portion of this case as it related to taxable year 1981 on the ground that the Court lacked jurisdiction because respondent did not determine a deficiency with respect to that year. Respondent did not object to petitioner's motion. The Court took the motion under advisement. By order dated Aug. 15, 1988, the Court granted petitioner's motion and further ordered that those portions of the petition relating to taxable year 1981 be considered stricken from the petition. Of course, the granting of this motion does not limit the Court from considering facts with relation to taxes for other years as necessary to redetermine the amount of deficiency in 1978, 1979, and 1980, respectively, as provided in sec. 6214(b).

[2] All section references, unless otherwise indicated, refer to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. All Rule references refer to the Tax Court Rules of Practice and Procedure.

asserted as his primary theory that the transaction in issue was a sale of a partnership interest. Petitioner filed an objection to respondent's motion and requested that respondent's motion be denied or alternatively, that respondent bear the burden of proof with respect to the matters contained in his amended answer. On February 19, 1985, a hearing was held on respondent's motion to amend his answer and petitioner's motion for continuance, at which time we took the matter under advisement. By order dated February 27, 1985, we agreed with petitioner that respondent's amended answer presented new matters under Rule 142(a), and we granted respondent's motion and ordered that the burden of proof be borne by respondent.[3]

After concessions by petitioner[4] and in light of respondent's amended answer, the primary issue for decision is whether petitioner's transfer to its three shareholders of a portion of a general partnership interest in a limited partnership, subject to nonrecourse and recourse liabilities in excess of basis, constitutes a taxable sale pursuant to sections 741 and 1001,[5] or whether the transaction, which occurred pursuant to an amendment of the partnership agreement, was an admission of new partners, a nontaxable event.

---

[3]Generally the burden of proof is on the taxpayer. *Welch v. Helvering,* 290 U.S. 111 (1933). Respondent bears the burden of proof, however, with "respect to any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer." Rule 142(a). A new theory or reason that is presented to sustain a deficiency is treated as a new matter when it increases the amount of the deficiency or requires the presentation of different evidence. See *Virginia Education Fund v. Commissioner,* 85 T.C. 743, 751 (1985), affd. 799 F.2d 903 (4th Cir. 1986); *Achiro v. Commissioner,* 77 T.C. 881, 890 (1981).

[4]Petitioner conceded various adjustments made by respondent, including net operating loss carryback/carryforward deductions for its taxable years in issue and related years. Petitioner also conceded respondent's disallowance of its distributable share of losses from Village Green Associates Partnership for fiscal years ended Jan. 31, 1978, and Jan. 31, 1979, as well as respondent's adjustment with respect to capital gain on the disposition of Village Green Associates.

[5]As a result of its amendment to answer, respondent has relegated his original position to that of an alternative argument. Thus, if we conclude that the Apr. 1, 1978, transfer was not a sale of a partnership interest, the issues for our decision are: (1) Whether Colonnade's transfer of a portion of its partnership interest in Georgia King Associates, which is subject to nonrecourse and recourse liabilities in excess of basis, resulted in a taxable distribution pursuant to sec. 311(c); (2) whether the fair market value limitation of sec. 311(c) operates to relieve petitioner of gain from the discharge of nonrecourse liabilities; and (3) if the recognized gain is limited to fair market value over basis, whether the fair market value of Georgia King Village is $16,500,000 or $12,200,000.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference.

### Colonnade Condominium, Inc.

Colonnade Condominium, Inc. (petitioner or Colonnade), is a corporation organized in June 1974 under the laws of the District of Columbia. Petitioner's principal place of business was Washington, D.C., when its petition was filed. Colonnade filed its Federal corporate income tax returns (Forms 1120) on the accrual basis of accounting with a fiscal year ending January 31.

The three shareholders of Colonnade were, and continue to be, Stewart Bernstein (Bernstein), Myer Feldman (Feldman), and John Mason (Mason). Bernstein and Mason are real estate developers, and Mason is also a banker with NS&T Bank. Feldman is a partner in the District of Columbia law firm of Ginsburg, Feldman & Bress. The three shareholders each own 30 shares of common stock and constitute the board of directors. During the years in issue, Bernstein was the president and treasurer; Feldman was the executive vice president; and Mason was a vice president and secretary. Corporate decisions were made by the three shareholders, who were aware of the policy and direction of the corporation as it related to real estate development and were somewhat aware of the accounting procedures used by its accounting firm.

In 1974, Colonnade embarked on the conversion of an apartment complex in Washington, D.C., known as the Colonnade, into condominiums for sale to the public. Beginning in 1976, Colonnade also developed a second condominium project known as Foxhall East. These two financially successful conversions were Colonnade's major projects. By the end of fiscal year ended January 31, 1979, all of the Colonnade and Foxhall East units had been sold. Due to economic conditions, Colonnade made no new investments for the period 1979 to 1981, although it did look for other real estate ventures.

Colonnade's gross income from sales and rent (gross receipts less costs of goods sold) from January 1976

through January 1981 was approximately $5 million. During these years of operation, Colonnade also reported a partnership loss from Georgia King Associates, a limited partnership in which Colonnade held a majority general partnership interest.[6]

These partnership losses, combined with other operating expense deductions, resulted in claimed net operating losses.[7] Due to these net operating losses, Colonnade did not have any taxable income for fiscal years ending January 31, 1976, through January 31, 1981.

Colonnade's reported tax picture for these years, as it pertains to the losses claimed from its investment in Georgia King Associates, is summarized as follows:

| FYE Jan. 31— | Gross income | Georgia King partnership loss | Taxable income (net operating loss) | Minimum tax paid |
|---|---|---|---|---|
| 1976 | $287,907 | 0 | ($1,181,360) | 0 |
| 1977 | 3,093,556 | ($1,096,819) | 0 | $18,025 |
| 1978 | 1,713,411 | (970,949) | 0 | 42,663 |
| 1979 | 63,244 | (215,071) | (295,435) | 11,041 |
| 1980 | 4,718 | (102,680) | (196,172) | 0 |
| 1981 | 292,049 | (112,179) | 0 | 11,971 |
| Totals | 5,454,885 | (2,497,698) | 0 | 83,700 |

The net operating losses for fiscal years ending January 31, 1976, 1979, and 1980, were carried back and forward to reduce to zero taxable income for fiscal years ending January 31, 1977, 1978, and 1981.

Colonnade declared no dividends and made no distributions to its three shareholders for fiscal years ending January 31, 1975, through January 31, 1980. For fiscal years ending January 31, 1976 through January 31, 1981, Colonnade's books included accounts receivable and notes receivable from its three shareholders, Bernstein, Feldman, and Mason. Initially, only the accounts receivable were posted on the books of Colonnade. In June 1978, approximately 70 percent of the accounts receivable were converted to notes receivable from the respective shareholders in the

---

[6]During the years in issue, Colonnade also had investments in Village Green Associates, another housing project partnership, Legend Associates, Caesar and Cleopatra Associates, and Capital Housing Partners-XX (CHP-XX). Due to petitioner's concessions, the transactions respecting Village Green Associates which respondent challenged in his notice of deficiency are no longer in issue.

[7]Respondent does not challenge the validity of petitioner's claimed net operating losses.

following amounts: Bernstein in the amount of $333,000; Feldman in the amount of $475,500; and Mason in the amount of $333,000. The cumulative total of the accounts receivable and notes receivable carried on the books of Colonnade is summarized as follows:

| FYE Jan. 31— | Mason | Feldman | Bernstein | Total |
|---|---|---|---|---|
| 1976 | $58,006 | $250,947 | $205,294 | $514,247 |
| 1977 | 55,506 | 252,795 | 202,794 | 511,095 |
| 1978 | 168,025 | 346,313 | 310,313 | 824,651 |
| 1979 | 469,878 | 612,750 | 469,878 | 1,552,506 |
| 1980 | 508,843 | 627,314 | 508,843 | 1,645,000 |
| 1981 | (293,233) | (299,930) | (293,232) | (886,395) |

These accounts and loans receivable for the period January 1976 to January 1981 resulted from numerous transactions including the issuance of checks; the values assigned to apartments and improvements to apartments received by Feldman and Bernstein and their relatives; cash proceeds from the sale of an apartment; and transfers of amounts receivable and notes receivable from Colonnade Ltd. (a Bernstein, Feldman, and Mason partnership), and the 2801 partnership.

As of December 17, 1980, the outstanding notes receivable and accounts receivable from Mason, Feldman, and Bernstein carried on Colonnade's books totaled $1,860,263. By corporate resolution on that same date signed by Bernstein, Feldman, and Mason as shareholders and directors, Colonnade made a $1,860,263 distribution to its shareholders of the notes and accounts receivable as follows:

| | Recipients | | |
|---|---|---|---|
| Items | Feldman | Mason | Bernstein |
| Promissory notes | $475,500 | $451,288 | $451,288 |
| Accounts receivable | 139,587 | 171,300 | 171,300 |
| | 615,087 | 622,588 | 622,588 |

Colonnade reported that, prior to the distribution, its unappropriated retained earnings for fiscal year ending January 31, 1981, was ($303,700). On their 1980 income tax returns, the shareholders claimed long-term capital gain with respect to the $1.8 million distribution.

### Georgia King Associates

Georgia King Associates (Georgia King or the partnership) is a limited partnership formed under the laws of New

Jersey for the purpose of constructing, developing, owning, maintaining, and operating low-income public housing projects pursuant to the Limited Dividend Non-Profit Housing Corporation Law of New Jersey, and the New Jersey Housing Finance Agency Law of 1976. Georgia King was formed to complete the development of Georgia King Village (the Village or the project), a 422-unit public housing project located in Newark, New Jersey.[8] Since its formation, Georgia King's sole project has been the Village, which it continues to own.

On August 2, 1976, a certificate of limited partnership (the certificate) was executed by the authorized representatives of To-Sault Renewal & Redevelopment Corp. (To-Sault), C.R.H.C., Inc. (CRHC), Colonnade, the general partners, and by Capital Housing Partners-XX (CHP-XX), the limited partner.[9] Pursuant to this certificate, which created the Georgia King Associates Limited Partnership, the percentages of profits, losses, and net cash-flow were initially allocated and distributed and capital contributions were required as follows:

| Partner | Partnership interest | Contributions |
|---|---|---|
| To-Sault (GP) | 0.01 | $50 |
| CRHC (GP) | 0.01 | 50 |
| Colonnade (GP) | 97.98 | 100 |
| CHP-XX (LP) | 2.00 | 100 |
| | 100.00 | 300 |

In addition to the above-stated contributions, Colonnade was to make additional contributions from time to time, and agreed to provide a $500,000 letter of credit on behalf of Georgia King in favor of the New Jersey Housing Finance Agency (NJHFA).

Among the stated partnership powers was the following provision:

g. To borrow money and to issue evidence of indebtedness, and to secure the same by mortgage, deed of trust, pledge or other lien, in furtherance of any or all of the objects of its business in connection with

---

[8]The U.S. Department of Housing and Urban Development (HUD) provided interest subsidy payments for the project pursuant to sec. 236 of title II of the National Housing Act, as amended, and rent supplement payments pursuant to sec. 101 of the Housing and Urban Development Act of 1965. Interest subsidy payments from HUD equal all but 1 percent of the interest rate of the mortgage.

[9]Colonnade was a general partner and a limited partner of CHP-XX.

said project provided that neither the Partnership nor any of its Partners shall be personally liable for the repayment of any such indebtedness.

To-Sault, a nonprofit corporation was the original owner of the Village and the mortgagor with NJHFA on a 100-percent, 48-year term mortgage in the amount of $18,250,000, which was acquired in August 1974. As of August 1974, the estimated development costs and capital requirements totaled $18,250,000, the amount of the mortgage. Included in these costs were such items as professional services, selling and renting expenses, and 2-year carrying and finance charges. In May 1976, the estimated development costs and capital requirements were revised for a total project cost of $20,278,000.[10] The $18,250,000 mortgage loan then constituted 89.9 percent of the total cost, resulting in a 10-percent equity requirement of $2,028,000.

On August 2, 1976, To-Sault agreed to convey its interest in the Village to Georgia King, subject to certain conditions.[11] To-Sault was to receive fees (acquisition, incentive management, and development) totaling $1,085,000 over a 9-year period. The fees were to be pledged by To-Sault to NJHFA on behalf of Georgia King in order to meet the 10-percent equity requirement of NJHFA in connection with the conversion of the project from a nonprofit organization (To-Sault) to a limited dividend organization (Georgia King). Under the offer and agreement to purchase (the purchase agreement), NJHFA would continue its financing in the amount of $18,250,000. The purchase agreement also designated To-Sault as the managing general partner and provided that To-Sault was to have the right of first refusal in the event the partnership received a bona fide offer from a third party to purchase the Village.

As a condition for its approval of the transfer of the Village from To-Sault to the partnership, NJHFA required that Georgia King agree to establish a development-cost

---

[10]The difference in costs resulted from increased carrying and finance charges, increased working capital cost, new conversion fees, change orders and anticipated change orders, and the establishment of a development cost escrow account.

[11]The offer and agreement to purchase stated that To-Sault and NJHFA believed that "development, construction, ownership and operation of the Project should be transferred to an experienced limited dividend sponsor working with To-Sault to provide more adequate financing for the Project."

escrow account (DCE account) totaling $965,000, to meet the equity requirement.[12] The agreement regarding development-cost escrow provided for a schedule of payments from Georgia King into the interest-bearing account on a yearly basis through 1984 as follows:

| Date | DCE[13] | Development costs[14] | Total |
|------|------|------|------|
| Sept. 1976 | $19,000 | $63,000 | $82,000 |
| Aug. 1, 1977 | 200,000 | 196,000 | 396,000 |
| Aug. 1, 1978 | 179,000 | 151,000 | 330,000 |
| Aug. 1, 1979 | 144,000 | 146,000 | 290,000 |
| Aug. 1, 1980 | 114,000 | 126,000 | 240,000 |
| Aug. 1, 1981 | 94,000 | 116,000 | 210,000 |
| Aug. 1, 1982 | 94,000 | 106,000 | 200,000 |
| Aug. 1, 1983 | 94,000 | 96,000 | 190,000 |
| Aug. 1, 1984 | 27,000 | 85,000 | 112,000 |
| | 965,000 | 1,085,000 | 2,050,000 |

On August 3, 1976, To-Sault deeded the Village to Georgia King.

On August 17, 1976, To-Sault and Georgia King entered into an assignment and assumption agreement with respect to the original mortgage, mortgage note, and related

[12]As a limited dividend entity, Georgia King is entitled to a 2-percent return on its equity investment provided that the development cost escrow account is maintained at a certain level.

[13]Pursuant to the agreement regarding development cost escrow, executed Nov. 12, 1976, the corpus of DCE account was to be used during the entire term of the mortgage loan for the purpose of paying (1) any expenses of operating the project, exclusive of capital expenditures in excess of income from operations; (2) the cost of capital improvements for design modifications to the project which (a) may be necessary or desirable for marketing the project, (b) would reduce the maintenance cost over the substantial portion of the term of the mortgage loan, (c) would benefit a substantial portion of the residents by providing desirable social services that will improve health, educational opportunities, and the general welfare of the residents, and (d) would make an important contribution to "the livability of the Project." The annual interest earned in the corpus was to be used during the term of the mortgage loan for the purpose of paying the partnership 50 percent of a 4-percent annual return on its equity investment in the project and a trustee's fee to NJHFA.

The acquisition fee, the management fee, and development fees were to be used for the purpose of paying (1) legal fees and other expenses associated with the conversion of ownership from a nonprofit entity to a limited dividend entity; (2) construction interest in an amount not to exceed $250,000 on the mortgage loan from NJHFA during the construction period; (3) any expenses of operating the project, including the payment of principal and interest on the mortgage loan from NJHFA from and after the date of commencement of the interest reduction payments and deed subsidy payments from HUD; and (4) for similar purposes stated earlier with respect to DCE, such as reducing maintenance or replacement cost over a substantial portion of the mortgage loan, or providing important contribution to livability of the project.

[14]These fees were pledged by To-Sault to fund, in part, the DCE account pursuant to the provisions of a trustee agreement between the partnership, To-Sault, and NJHFA. Upon receipt of the funds from the partnership as deposited in the DEC account, NJHFA was required to deposit in the DCE account $1,100,000 consisting of an acquisition fee, a nonprofit development fee, and a nonprofit incentive management fee.

agreements (the original financing agreements). Under the assignment and assumption agreement, To-Sault assigned the August 7, 1974, original financing agreement to Georgia King. Georgia King assumed all of To-Sault's rights and obligations to pay principal and interest on the $18,250,000 indebtedness to NJHFA. The agreement provided that "for the purpose of establishing and continuing the existence of the indebtedness * * * it is a condition * * * that neither the Assignee [Georgia King] nor any general partner or limited partner thereof shall assume any personal liability with respect thereto."

*October 20, 1976, Partnership Agreement and First Amended Certificate of Limited Partnership*

On October 20, 1976, the general partners and limited partner of Georgia King (the Georgia King partners) amended certain terms and provisions of the August 2, 1976, certificate.[15] Pursuant to sections 5.01 and 10.01(a) of the agreement and first amended certificate of limited partnership (the October 20, 1976, agreement), the percentage of profits, losses, and net cash - flow available for distribution and capital contributions were allocated as follows:

| Partner | Percentage interest | Contributions |
|---|---|---|
| To-Sault (GP) | 0.01 | $50 |
| CRHC (GP) | 0.01 | 50 |
| Colonnade (GP) | 97.98 | 2,164,600 |
| CHP-XX (LP) | 2.00 | 62,100 |
| | 100.00 | 2,226,800 |

Under the October 20, 1976, agreement, Colonnade's $2,164,600 capital contribution was payable in nine yearly installments through June 1984. In addition to its originally stated $100 capital contribution, CHP-XX was to contribute $62,000 in June 1984. Except for the first 2 years of scheduled payments, the payment schedule for Colonnade's capital contributions (and including that of CHP-XX in 1984) corresponded to the combined total of the DCE and develop-

---

[15]This document was subsequently filed with the State of New Jersey on Nov. 10, 1976.

ment costs payable on an annual basis through August 1984.[16]

Section 5.01(c) of the October 20, 1976, agreement also provided for a reallocation of capital contributions between Colonnade and CHP-XX:

Colonnade and CHP-XX may, at their sole election, hereafter agree upon a reallocation of the amount of capital contribution to be made by each of them, provided however in no event shall the total be less than $2,226,600. In the event of such an agreement the Interests of Colonnade and CHP-XX shall be increased or decreased, as appropriate to reflect such reallocation of their obligation to make Capital Contributions.

Under article II, "contribution" was defined as follows:

"Capital Contribution" means the total amount of money or other property contributed or agreed to be contributed, as the context requires, to the Partnership by each Partner pursuant to the terms of this Agreement. Any reference to the Capital Contribution of a Partner shall include the Capital Contribution made by a predecessor holder of the Interest of such Partner.

The October 20, 1976, agreement also provided that subject to any reallocation pursuant to section 5.01(c), certain defined gains (section 10.03(a) gains) recognized by the partnership upon the sale, exchange, or other disposition of the Village were to be allocated according to the percentage interest of the partners for profits and losses. Gains in excess of defined gains and losses on the sale of the Village (section 10.03(c) gains and losses), were to be allocated as follows:

---

[16]For example, under the Oct. 20, 1976, agreement Colonnade was to make aggregate capital contributions on the following payment schedule:

| Date | Amount |
| --- | --- |
| Oct. 15, 1976 | $63,300 ($195,300 minus $132,000 previously paid) |
| June 15, 1977 | 459,300 |
| June 15, 1978 | 330,000 |
| June 15, 1979 | 290,000 |
| June 15, 1980 | 240,000 |
| June 15, 1981 | 210,000 |
| June 15, 1982 | 200,000 |
| June 15, 1983 | 190,000 |
| June 15, 1984 | 50,000 |

| Partner | Percentage |
|---|---|
| Colonnade (GP) | 75.00 |
| To-Sault (GP) | 10.00 |
| CRHC (GP) | 14.99 |
| CHP-XX (LP) | 0.01 |

Likewise, section 10.05(a) provided for the distribution of proceeds from the sale or refinancing of the project, with any remaining proceeds, after payoff of liabilities and return of contributions, going to the partners, pursuant to section 10.05(a)(vi), in the same percentage as excess recognized gains reflected in section 10.03(c).

With respect to the lack of personal liability for mortgage financing, the October 20, 1976, agreement slightly altered the original wording of the certificate, but restated that the partnership and the partners shall have no "personal liability for the payment of a Mortgage or other such indebtedness, but that the sole recourse of any lender shall be to the property securing the Mortgage or other such indebtedness."

The October 20, 1976, agreement stated:

In determining the Federal tax basis of their Interest in the Partnership, the Partners may take into account their allocable share of any nonrecourse mortgage indebtedness incurred by the Partnership (to the extent of the fair market value of the properties secured) in the same proportion as they share in the profits and losses of the Partnership.

Under section 6.01, none of the general partners were entitled to withdraw from the partnership, or to sell or assign their interests without the prior consent of NJHFA and CHP-XX. Section 6.02 of the October 20, 1976, agreement set forth the following terms and conditions for the "admission of a successor or additional general partner:"

(a) the admission of such Person shall have been Consented to by CRHC, Colonnade, To-Sault and NJHFA;

(b) the successor Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement, by executing a counterpart thereof, * * * and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a General Partner; and this Agreement evidencing the admission of such Person as a General Partner shall have been filed for recordation * * *

\*        \*        \*        \*        \*        \*        \*

(d) counsel for the Partnership shall have rendered an opinion that the admission of the successor Person is in conformity with the Uniform Limited Partnership Act of the State of New Jersey and that none of the actions taken in connection with the admission of the successor Person will cause the termination of dissolution of the Partnership or will cause it to be classified other than a partnership for Federal income tax purposes.

Section 6.03 which set forth the effect of bankruptcy, death, withdrawal, dissolution, or incompetence of a general partner, provided, in part, that the "dissolution of Colonnade, the effect of which is the transfer of its interest to Myer Feldman, John J. Mason, Stewart A. Bernstein, or any of them, shall not cause the termination" of the partnership.

Under section 7.01 of the October 20, 1976, agreement, To-Sault was designated as the managing general partner.

Section 7.08(a) provided that the corporation was to maintain such net worth "necessary to assure that the Partnership is classified as a partnership for Federal income tax purposes,"[17] and per section 7.08(c) it was understood and agreed that Colonnade could nominate Bernstein, Feldman, and Mason or any one of them to become a substitute general partner for the purpose of meeting the requirements of section 7.08(a).

Georgia King, which filed its partnership returns on the accrual method of accounting for the calendar year, claimed a total tax loss for 1976 in the amount of $1,119,432. As a 97.98-percent general partner, Colonnade's portion of the loss was $1,096,819, which it claimed on its corporate return for fiscal year ending January 31, 1977. Colonnade also claimed its portion of loss attributable to its interest in CHP-XX in the amount of $67,229.[18]

Colonnade's reported adjusted basis at the end of the 1976 partnership year was $19,293,340. Colonnade's basis included its share of the nonrecourse partnership mortgage on the Village, plus the $2,164,400 total capital contribution required. Colonnade's initial total adjusted basis of $20,390,159 was then reduced by $1,096,819, the amount of

---

[17]Colonnade's net worth in January 1977 was in excess of $3.5 million.

[18]When considering Colonnade's investment (cash contribution) of $195,300 in 1976 versus its tax loss of $1,096,819, Colonnade obtained a 5.6 to 1 tax writeoff from its Georgia King general partnership interest for fiscal year ending Jan. 31, 1977.

the claimed partnership loss, to arrive at the reported adjusted basis of $19,293,340.

Throughout the course of its investment in Georgia King and CHP-XX, Colonnade received draft projections of anticipated taxable income and losses. For example, in a letter dated November 22, 1976, from Martin Schwartzberg (Schwartzberg)[19] to Feldman, Schwartzberg discussed a contemplated amendment to the October 20, 1976, agreement to provide for a reallocation of the profits, losses, and cash-flow between Colonnade and CHP-XX. Enclosed with the letter were projections of tax losses resulting from Colonnade's investment in Georgia King and CHP-XX. According to Schwartzberg, units of CHP-XX were to be sold in 1977, and Schwartzberg advised Feldman that "in divesting [Colonnade] of its obligations commencing in 1977 and its percentage of interest in [Georgia King], a variety of alternatives are available." There were no references to any reorganization of the partnership affecting any partner's interest other than with respect to Colonnade and CHP-XX.

On July 8, 1977, Schwartzberg wrote to Feldman again and enclosed various exhibits pertaining to the allocation of projected tax losses and investments in Georgia King. Exhibit A to the letter was a 1977 revision of the allocations projected in 1976. The 1976 projections were based on the assumption of a "sale of 49 percent to CHP-XX in 1977 by Georgia King Associates" and a "sale of 25 percent to Georgia King Associates I in 1978 by Georgia King Associates." In 1977, the 1976 projections were "revised to reflect payments by Colonnade assuming no further sale of its interest in Georgia King Associates."[20]

*January 19, 1977, Amendment to Agreement and First Amended Certificate of Limited Partnership*

On January 19, 1977, the Georgia King partners executed an amendment to agreement and first amended certificate of limited partnership. A revised amendment to agreement and

---

[19]Martin Schwartzberg was the president of both CRHC and Capital Realty Investments, Inc. (CRI), the latter being a general partner of CHP-XX. Schwartzberg played a key role in the Georgia King and CHP-XX partnerships.

[20]The parties have stipulated that if Schwartzberg had been called to testify at trial, he would have stated that he did not intend to characterize the transactions as sales. Rather, he would state that the transactions were changes in the ownership of partnership interests.

revised first amended certificate of limited partnership (technical corrections) was signed as of January 19, 1977, on March 29, 1977 (the January 19, 1977, revised amendment). Both amendments were filed with the State of New Jersey.

As a result of the January 19, 1977, revised amendment, the percentage of profits, losses, and net cash-flow available for distribution as defined in section 10.01(a), and the section 10.03(a) gains were reallocated between Colonnade and CHP-XX as follows:

| Partner | Prior to 1/77 | After 1/77 | (Decrease)/Increase |
|---|---|---|---|
| To-Sault (GP) | 0.01% | 0.01% | - - - |
| CRHC (GP) | 0.01 | 0.01 | - - - |
| Colonnade (GP) | 97.98 | 50.98 | (47%) |
| CHP-XX (LP) | 2.00 | 49.00 | 47 |

Correspondingly, the section 10.03(c) gains and losses and the section 10.05(a)(vi) distributions were reallocated as follows:

| Partner | Prior to 1/77 | After 1/77 | (Decrease)/Increase |
|---|---|---|---|
| To-Sault (GP) | 10.00% | 10.00% | - - - |
| CRHC (GP) | 14.99 | 15.00 | 0.01% |
| Colonnade (GP) | 75.00 | 37.50 | (37.50) |
| CHP-XX (LP) | .01 | 37.50 | 37.49 |

The aggregate capital contributions of Colonnade and CHP-XX were reallocated as follows:

| Partner | Prior to 1/77 | After 1/77 | (Decrease)/Increase |
|---|---|---|---|
| To-Sault (GP) | $50 | $50 | - - - |
| CRHC (GP) | 50 | 50 | - - - |
| Colonnade (GP) | 2,164,600 | 1,330,300 | ($834,300) |
| CHP-XX (LP) | 62,100 | [21]896,400 | 834,300 |
| | 2,226,800 | 2,226,800 | |

Under the January 19, 1977, revised amendment, Colonnade's capital contribution became payable in seven yearly installments (with one installment previously paid) through 1982, and Colonnade was entitled to receive refunds in the amounts of $24,000 and $45,000, in 1983 and 1984, respectively. CHP-XX's obligation to contribute was payable in eight installments through 1984.

---

[21]The CHP-XX contribution was stated in the revised amendment to be $896,300; however, the contribution total was understated by $100, the initial contribution amount. Thus, the total contribution was $896,400.

At the time the partners executed the January 19, 1977, revised amendment (which increased CHP-XX's limited partnership interest to 49 percent), the syndication of the CHP-XX partnership took place simultaneously. Prior to the January 19, 1977, revised amendment, Colonnade had an 80-percent interest in CHP-XX. As a result of the syndication of CHP-XX, Colonnade's interest in CHP-XX was reduced to 0.0247 percent. The limited partners that acquired interests pursuant to the syndication, totaling 95.07 percent, were unrelated to Colonnade.

Georgia King claimed a total tax loss of $1,635,090 for the 1977 tax year. Colonnade's portion of that loss was $970,949, which it claimed on its corporate return for fiscal year ending January 31, 1978. The $970,949 loss was calculated on the basis of Colonnade's retained 50.98-percent interest in Georgia King for the entire year and its allocable interest in CHP-XX as reduced pursuant to the syndication.[22]

Colonnade's partnership interest in Georgia King was reported to have dropped from 97.98 percent to 50.98 percent, a decrease of 47-percentage points, while CHP-XX partnership's interest rose from 2 percent to 49 percent, or a gain of 47-percentage points.[23] Similarly, Colonnade's share of partnership nonrecourse liabilities was reduced to reflect the reduction of its partnership interest to 50.98 percent.

Colonnade's beginning capital account was reported on the 1977 Schedule K-1 as $1,067,781. With respect to its obligation to contribute $834,300[24] in the future (which was assumed by CHP-XX), Colonnade treated the reduction of its amount of future capital contributions as a negative contribution of $764,700. The $69,000 to be refunded in 1983 and

[22]When considering Colonnade's investment (cash contribution) of $189,000 in 1977 versus its tax loss of $970,949, Colonnade obtained a 5.1 to 1 tax writeoff from its general partnership interest in Georgia King for fiscal year ending Jan. 31, 1978.

[23]Colonnade did not treat the Jan. 19, 1977, "reallocation" transaction as a taxable event for fiscal year ending Jan. 31, 1977. Although respondent contends that the reallocation which occurred pursuant to the Jan. 19, 1977, revised amendment was a taxable sale which should have triggered short-term capital gain, it is not an issue in this case because fiscal year ending Jan. 31, 1977, was closed to respondent at the time of examination. We express no opinion as to whether the transaction constituted a taxable sale or exchange of a partnership interest.

[24]We adopt the figure $834,300 because both parties used this figure on brief and at trial. However, we note that the sum of $764,700 and $69,000 is $833,700, a figure $600 less than the parties' figure.

1984 pursuant to the January 19, 1977, revised amendment was not included in this reduction. After taking into consideration the $970,949 loss, Colonnade's yearend capital account was reported as ($670,854).

*The April 1, 1978, Third Amendment to Agreement and First Amended Certificate of Limited Partnership* [25]

On April 1, 1978, the Georgia King partners executed a third amendment to agreement and first amended certificate of limited partnership. A revised version of this third amendment to agreement was executed on April 11, 1979, in order to correct typographical errors (the revised third amendment). As a result of the revised third amendment, the profits, losses, and net cash-flow available for distribution as defined in section 10.01(a) and the section 10.03(a) gains (but not losses) of the Georgia King partnership were changed in the following manner to reflect the admission of Bernstein, Feldman, and Mason as general partners:

| Partner | Prior to 4/78 | After 4/78 | (Decrease)/Increase |
|---|---|---|---|
| To-Sault (GP) | 0.01% | 0.01% | - - - |
| CRHC (GP) | 0.01 | 0.01 | - - - |
| CHP-XX (LP) | 49.00 | 49.00 | - - - |
| Colonnade (GP) | 50.98 | 10.00 | (40.98%) |
| Bernstein (GP) | - - - | 13.66 | 13.66 |
| Feldman (GP) | - - - | 13.66 | 13.66 |
| Mason (GP) | - - - | 13.66 | 13.66 |

The section 10.03(c) gains and losses and the section 10.05(a)(vi) distributions of Georgia King were changed as follows:

| Partner | Prior to 4/78 | After 4/78 | (Decrease)/Increase |
|---|---|---|---|
| To-Sault (GP) | 10.00% | 10.00% | - - - |
| CRHC (GP) | 15.00 | 15.00 | - - - |
| CHP-XX (LP) | 37.50 | 37.50 | - - - |
| Colonnade (GP) | 37.50 | 7.50 | (30%) |
| Bernstein (GP) | - - - | 10.00 | 10 |
| Feldman (GP) | - - - | 10.00 | 10 |
| Mason (GP) | - - - | 10.00 | 10 |

---

[25] A second amendment to agreement and first amended certificate of limited partnership was executed in Oct. 24, 1977, and subsequently filed with the State of New Jersey on Dec. 30, 1977. It is not germane to the disposition of this case; therefore its provisions will not be discussed.

Similarly, the capital contributions of the Georgia King partners were changed as follows:

| Partner | Prior to 4/78 | After 4/78 | (Decrease)/Increase |
|---|---|---|---|
| To-Sault (GP) | $50 | $50 | - - - |
| CRHC (GP) | 50 | 50 | - - - |
| CHP-XX (LP) | 896,400 | [26]896,400 | - - - |
| Colonnade (GP) | 1,330,300 | [27]514,240 | ($816,060) |
| Bernstein (GP) | - - - | 272,020 | 272,020 |
| Feldman (GP) | - - - | 272,020 | 272,020 |
| Mason (GP) | - - - | 272,020 | 272,020 |
| Total | 2,226,800 | 2,226,800 | |

Pursuant to the revised third amendment, Colonnade's capital contribution remained payable in seven yearly installments (two installments through 1982 in the amounts of $195,300 and $189,000 were previously paid), and Colonstallments (two installments through 1982 in the amounts of $195,300 and $189,000 were previously paid), and Colonnade was to receive refunds in 1983 ($24,000) and in 1984 ($45,000). Bernstein, Feldman, and Mason assumed Colonnade's obligation to contribute $816,060 to the capital of the Georgia King partnership and assumed the same payment schedule as Colonnade with respect to the $816,060. As such, Bernstein, Feldman, and Mason became obligated to pay their capital contributions in five yearly installments through 1982.[28] There were no other changes to the Georgia King partnership with respect to any of the other partners. Bernstein, Feldman, and Mason remained as majority general partners through their individual and corporate partnership interests. There were no changes in the operation of the Georgia King partnership as a result of the revised third amendment. The payment schedule for

[26]See note 21, *supra.*

[27]Under the amendment to the partnership agreement, the actual amount of Colonnade's total capital contributions due and payable was $583,240. The figure of $514,240 reflects the refund payments due Colonnade in 1983 and 1984 in the amounts of $24,000 and $45,000, respectively.

[28]The revised third amendment provided that Bernstein, Feldman, and Mason shall each make capital contributions on the following schedule:

| | |
|---|---|
| June 15, 1978 | $63,248 |
| June 15, 1979 | 61,908 |
| June 15, 1980 | 58,960 |
| June 15, 1981 | 55,208 |
| June 15, 1982 | 32,696 |

CHP-XX remained unchanged by the revised third amendment.

When Colonnade transferred a portion of its general partnership interest in Georgia King on April 1, 1978, the fair market value of the Village was less than its basis.[29]

Georgia King reported a total tax loss of $1,062,341 for the 1978 year.[30] Colonnade's portion of the loss was $215,071 which it claimed on its corporate return for fiscal year ending January 31, 1979.[31]

Colonnade's partnership interest in Georgia King was reported to have dropped from 50.98 percent to 10 percent (a decrease of 40.98 percentage points), while Bernstein, Feldman, and Mason each acquired a partnership interest of 13.66 percent "from another partner" for a total increase of 40.98 percentage points. Colonnade's share of partnership nonrecourse liabilities was reduced to reflect the reduction in its partnership interest to 10 percent.

On the 1978 Schedule K-1, Colonnade's beginning capital account was reported as ($670,854). The reduction of the amount of capital to be contributed in the future, which was assumed by the three shareholders, was shown as a "withdrawal or distribution" in the amount of $816,060. After taking into consideration the $215,071 tax loss,

[29]Both petitioner and respondent called expert witnesses to testify with respect to the fair market value of the Village, the only partnership property. Respondent's expert witness, Richard M. Chaiken, determined that the fair market value of the Village as of Apr. 1, 1978, was $16,500,000 or $6,761,700 for the 40.98-percent interest which Colonnade transferred. Petitioner's expert, Richard DiGeronimo, valued the Village as of Apr. 1, 1978, at $12,200,000 for a fair market value of $4,999,560 for Colonnade's 40.98-percent interest.

[30]The parties stipulated that if Richard Lager, the national director of tax services for Alexander Grant & Co. (Alexander Grant), the accounting firm for the Georgia King partnership, were called to testify, he would testify that he advised the Alexander Grant accountant who prepared the 1978 partnership return for Georgia King that new members Bernstein, Feldman, and Mason were admitted to the partnership and that the 1978 partnership return of Georgia King would have to be corrected accordingly to reflect the change of ownership in partnership interests.

[31]The $215,071 loss was calculated as follows:

| Interest in Georgia King | Period | Amount |
|---|---|---|
| 50.98% | 1/1/78 - 04/01/78 | $135,395 |
| 10.00 | 4/1/78 - 12/31/78 | 79,676 |
| | | 215,071 |

When considering Colonnade's investment, cash contributions of $46,256 in 1978 versus its tax loss of $215,071, Colonnade obtained a 4.6 to 1 tax writeoff from its Georgia King general partnership interest for fiscal year ending Jan. 31, 1979.

Colonnade's yearend capital account was reported as ($1,701,985).

Colonnade did not treat the April 1, 1978, transfer of its 40.98-percent partnership interest to Bernstein, Feldman, and Mason as a taxable event in fiscal year ending January 31, 1979, nor did Colonnade treat the April 1, 1978, transfer as a distribution with respect to its stock.

For their 1978 taxable year, Bernstein, Feldman, and Mason each claimed a tax loss in the amount of $108,837 from Georgia King. The reported share of partnership liabilities (nonrecourse and recourse) for Bernstein, Feldman, and Mason was based on their acquisition of a 13.66-percent interest each in the partnership. Bernstein, Feldman, and Mason each treated the $272,020 capital to be contributed in the future as capital contributed during the year, and reduced their capital accounts by the tax losses claimed to $163,183.

In the statutory notice of deficiency, respondent determined that Colonnade's transfer of its 40.98-percent general partnership interest to Bernstein, Feldman, and Mason resulted in a long-term capital gain in the amount of $1,454,874.

OPINION

Respondent contends that Colonnade's transfer of a portion of its partnership interest in Georgia King Associates to its three shareholders pursuant to the April 1, 1978, amendment to the partnership agreement resulted in the sale of a 40.98-percent general partnership interest by Colonnade in return for the discharge of recourse and nonrecourse partnership liabilities. Accordingly, respondent argues that such disposition should be governed by sections 741 and 1001. Respondent bears the burden of proof on this issue. Petitioner, on the other hand, asserts that the April 1, 1978, amendment merely provided for the admission of new partners in an existing partnership and is a nontaxable event.

We agree with respondent. After a careful examination of the facts and circumstances, we conclude that on this record respondent has met his burden of proof in establishing that Colonnade's transfer of a portion of its general partnership

interest was, in substance, a taxable sale or exchange pursuant to section 741. Because of this conclusion, we need not address respondent's alternative arguments.[32]

The statutory scheme under subchapter K gives partners great latitude in selecting the form the partnership takes and in allocating economic benefits and tax burdens of partnership transactions among themselves. See, e.g., *Hamilton v. United States,* 231 Ct. Cl. 517, 524-525, 687 F.2d 408, 412-413 (1982); *Foxman v. Commissioner,* 41 T.C. 535, 551 (1964), affd. 352 F.2d 466 (3d Cir. 1965); McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners, par. 1.03 (1977), citing H. Rept. 1337, 83d Cong., 2d Sess. 65 (1954). Under the partnership provisions of the Code, this flexibility is achieved by, inter alia, allowing a partner to choose either to sell his partnership interest to a third person or to reorganize the partnership to allow the admission of the third person as a new partner.

This flexibility, however, is not unlimited. The form of the transaction must be in keeping with its true substance and the intent of the parties. See *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945); *Gregory v. Helvering,* 293 U.S. 465 (1935) (the substance, rather than the form, of the transaction is controlling). In this regard, the provisions of written documents are not necessarily conclusive for tax purposes. *Highland Hills Swimming Club, Inc. v. Wiseman,* 272 F.2d 176 (10th Cir. 1959). Nor will a "label" attached by a tax-conscious litigant control the proper characteriza-

---

[32]As part of his primary theory set forth in his amended answer, respondent's position is that the transaction is not governed by sec. 311(c) because petitioner did not make a distribution with respect to its stock in fiscal year ending Jan. 31, 1979. Respondent relies on sec. 1.311-1(e), Income Tax Regs., which states that sec. 311 does not apply to a transaction between a corporation and a shareholder in his capacity as a debtor, creditor, employee, or vendee where the fact that such debtor, creditor, employee, or vendee is a shareholder is incidental to the transaction. Respondent also cites *Honigman v. Commissioner,* 466 F.2d 69 (6th Cir. 1972) (sec. 311 does not pertain to a sale between a corporation and its shareholder) and *Owens Machinery Co. v. Commissioner,* 54 T.C. 877, 881 (1970) (distribution with respect to stock under sec. 311 refers to a distribution without consideration), in support of his position.

On the facts of this case, there is no indicia that Colonnade's transfer of a portion of its general partnership interest was intended to be a distribution to its shareholders. Moreover, the parties stipulated that no corporate distributions were made for fiscal years ending Jan. 31, 1975 through Jan. 31, 1980. Accordingly, because we have found that the disposition was a sale, we express no view on the novel issue of whether the fair market value limitation of sec. 311(c) operates to relieve petitioner of gain from the discharge of nonrecourse liabilities. Nor is it necessary for us to determine the fair market value of the property as of Apr. 1, 1978.

tion of a transaction involving the disposition of a partnership interest. *Crenshaw v. United States*, 450 F.2d 472, 476-477 (5th Cir. 1971). In short, "the legislative policy of flexibility does not permit a taxpayer to avoid the tax ramifications of a sale of a partnership interest simply by recasting the intended or constructive sale in the form of a reorganization to a partnership. *Jupiter Corp. v. United States,*" 2 Cl. Ct. 58, 79 (1983).

Section 741 provides that in the case of the sale or exchange of a partnership interest, gain or loss shall be recognized to the transferor partner. The gain or loss, except to the extent that section 751 applies, is capital.[33] Section 741 shall apply whether the partnership interest is sold to a member or nonmember of the partnership. Sec. 1.741-1(b), Income Tax Regs.

Section 721(a) states the general rule that gain or loss is not recognized through contributions of property to a partnership in exchange for partnership interests. Correspondingly, in a distribution by a partnership to a partner under section 731(a)(1), gain shall not be recognized except to the extent the distribution exceeds adjusted basis.[34] Decreases in a partner's liabilities or share of the partnership's liabilities are considered distributions under section 752(b). Section 705(a)(2) provides that a partner's adjusted basis is decreased by his distributions from the partnership as well as the partner's distributive share of partnership losses. Petitioner argues that, as of April 1, 1978, three new partners were admitted to the partnership and, as a result, petitioner received a distribution as a result of being relieved of its share of partnership liabilities. Petitioner's basis in the partnership was reduced pursuant to section 705(a)(2).

The Code and regulations do not offer any guidance for distinguishing between an admission of new partners (pur-

---

[33]The characterization of the gain as ordinary under the recapture provisions is not before the Court.

[34]Sec. 1.731-1(c)(3), Income Tax Regs., however, provides an exception to the general rule of sec. 731 that partnership distributions are not taxable. It states that a distribution may not qualify under sec. 731 if there is a contribution of property to a partnership and within a short period of time before or after the contribution other property is distributed to the contributing partner, or if the contributed property is distributed to another partner. Such transactions shall be treated as exchanges of property. In applying the regulation, substance controls over form. See sec. 1.707-1(a), Income Tax Regs. See Rev. Rul. 57-200, 1957-1 C.B. 205, for an example where the Commissioner applies the regulation.

suant to a contribution of property which is nontaxable under section 721), as petitioner contends is the correct characterization of the transaction before us, and a sale of a partnership interest under section 741, taxable as respondent urges. In one of the few cases addressing this issue, this Court in *Richardson v. Commissioner,* 76 T.C. 512 (1981), affd. 693 F.2d 1189 (5th Cir. 1982), commented on the difference between the admission of a new partner into a partnership and the sale or exchange of a partnership interest:

> Admission of new partners is not in all respects identical to a sale or exchange of a partnership interest. In the former situation, the transaction is between the new partners and the partnership. The latter situation involves a transaction between a new partner and an existing partner. * * * [76 T.C. at 528.]

In *Richardson,* the taxpayers unsuccessfully maintained that they had sold their interest in three partnerships on December 30, 1974. 76 T.C. at 527-528. The admission of the new partners in *Richardson* corresponded with the infusion of large amounts of new capital into the partnership, although capital was not reduced with respect to the old partners. The transaction was essentially between the new partners and the partnership. Upon the admission of the new partners, the interests of all the original partners were reduced substantially. This Court viewed the transaction as an admission rather than a sale.

Unlike *Richardson,* the form and substance of the transaction at issue herein reflects transfers between an existing partner, Colonnade, and new partners, Bernstein, Feldman, and Mason and, therefore, was a sale of a partnership interest. The partnership as a whole was essentially unaffected. Prior to the April 1, 1978, amendment, Colonnade held a 50.98-percent partnership interest. As a result of the amendment, Colonnade divested itself of a 40.98-percent interest, which was acquired collectively by Bernstein, Feldman, and Mason at 13.66 percent each. Colonnade was left with a 10-percent interest, but together with its three shareholders, Colonnade still controlled the partnership as the majority general partner. The interests of the other partners in Georgia King were unchanged by the amendment.

Similarly, Colonnade divested itself of its rights under sections 10.03(c) and 10.05(a)(vi) of the partnership agreement (allocations of certain gains and losses) to the extent of 30 percent which were acquired collectively by Bernstein, Feldman, and Mason at 10 percent each. Again, the allocations under these two sections remained unchanged with respect to To-Sault, CRHC, and CHP-XX. Most notably, the aggregate capital contributions of Georgia King, $2,226,800, remained the same before and after the April 1, 1978, amendment. No additional contributions were required under the April 1, 1978, amendment to the partnership agreement. Colonnade, however, was discharged of its recourse obligation to contribute $816,060 in the future, an obligation which was acquired equally between Bernstein, Feldman, and Mason at $272,020 each. The total payment schedule for the contributions (in yearly installments) remained unchanged and continued to mirror the total equity payments required of the partnership. Colonnade was also discharged of 40.98 percent of its partnership nonrecourse liabilities, which were acquired by the three individual shareholders.

The fact that the three shareholders of Colonnade expressly assumed Colonnade's liabilities, in return for partnership interests which are capital assets under section 741, is especially significant. In determining whether an actual or constructive sale or exchange took place, we note that the touchstone for sale or exchange treatment is consideration. In *LaRue v. Commissioner,* 90 T.C. 465, 483-484 (1988), we noted that where liabilities are assumed as consideration for a partnership interest, a sale or exchange exists:

If, in return for assets, any consideration is received, even if nominal in amount, the transaction will be classified as a sale or exchange. *Blum v. Commissioner,* 133 F.2d 447 (2d Cir. 1943). * * * When the transferee of property assumes liabilities of the transferor encumbering the property, the liability is an amount realized by the transferor. *Crane v. Commissioner,* [331 U.S. 1 (1947)]; *Commissioner v. Tufts,* [461 U.S. 300 (1983)]. Assumption of liabilities by the transferee constitutes consideration making the transaction a sale or exchange. *Wilkinson v. United States,* 177 F. Supp. 101 (S.D. Ala. 1959).

* * * Where assets are transferred to third parties, assumption of liabilities constitutes consideration. * * *

\* \* \* the assumption of liabilities by a third party transferee constitutes an amount realized, and this is consideration to the transferor. *Crane v. Commissioner,* [supra]; *Tufts v. Commissioner,* [supra].

In arguing that the form of the arrangement reflects the substance, petitioner points out that the documents show that Bernstein, Feldman, and Mason were admitted to the partnership upon obtaining the required approval of NJHFA, as well as To-Sault, the managing general partner. Petitioner contends that the documents demonstrate an agreement between the partnership and the partners for the admission of new partners and do not reflect a transaction between petitioner and the new general partners. However, as we noted earlier, labels, semantics, technicalities, and formal documents do not necessarily control the tax consequences of a given transaction. See *Helvering v. Lazarus & Co.,* 308 U.S. 252, 255 (1939). See also *Frank Lyon Co. v. United States,* 435 U.S. 561, 572 (1978); *Blueberry Land Co. v. Commissioner,* 361 F.2d 93, 101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964). To look solely to the documents in this case and ignore the substance and reality of the transaction would exalt form over substance.

Aside from the transfer of a portion of Colonnade's partnership interest to the three new partners in return for a discharge of liabilities, there were no other changes in the structure or the operation of the Georgia King partnership as a result of the April 1, 1978, amendment. The substance of the transaction did not transpire between the partnership and the new partners, but rather, between Colonnade, an existing partner, and three new partners. Because there was no new or additional capital transferred to the partnership, there were no modifications of the partnership assets and liabilities. The only change was the transfers from the transferor partner's capital account to the transferees' capital accounts. As such, the transaction warrants sale and exchange treatment under section 741.

Petitioner relies on numerous cases and a revenue ruling in support of its position that the transaction of April 1, 1978, involved nothing more than the admission of new members to an existing partnership under section 721. For the reasons set forth below, we find this authority to be distinguishable from the transaction presently before us.

Petitioner asserts that the "first phase" of the transaction in *Commissioner v. Tufts*, 461 U.S. 300 (1983), is strikingly similar to the facts of the instant case. In *Tufts*, Pelt and his wholly owned corporation, Clark, were originally 90-percent and 10-percent partners, respectively, in a general partnership. Neither Pelt nor Clark made any capital contributions to the partnership at the time of the formation and the partnership obtained a nonrecourse loan for the construction of an apartment. Thereafter, the partnership agreement was amended to admit four new partners. Pelt's interest was reduced to 25 percent, and Clark's interest remained at 10 percent. The new partners collectively acquired a 65-percent interest, without making any capital contributions to the partnership at the time of admission. Subsequently, all the partners made cash contributions. The following year, each partner sold his partnership interest to a third party, Bayles. Bayles acquired the complex subject to the nonrecourse liability at a time when the fair market value of the property had decreased.

Each partner reported the sale of his partnership interest on his Federal income tax return for the year 1972 as a loss. The Supreme Court held that taxable gain resulted in 1972 from the sale of the partnership interest because the amount realized equaled the balance of the nonrecourse liability even though the balance exceeded the fair market value of the apartment complex.

Petitioner here argues that because there was no suggestion in *Tufts* that the admission of the new partners in 1970 gave rise to a sale or exchange of a partnership interest, respondent's position in the instant case is erroneous. However, the year 1970 was not before the Court in *Tufts*, and furthermore, the transaction giving rise to the admission of new partners was not at issue. Therefore, *Tufts* presents no legal or factual bar to respondent's position because the instant issue was not litigated in *Tufts*.

Petitioner also refers to the taxable sale in *Tufts* as "phase two" and submits that this phase has not been reached in the instant case because Colonnade and the three shareholders have not yet sold their partnership interest. However, it is apparent that Colonnade has disposed of a

portion of its interest, and under the facts presented, we find petitioner's reliance on *Tufts* misplaced.

In arguing that a taxable event did not occur on April 1, 1978, petitioner also cites *Jupiter Corp. v. United States,* 2 Cl. Ct. 58 (1983), and *Communications Satellite Corp. v. United States,* 223 Ct. Cl. 253, 625 F.2d 997 (1980).[35] In *Jupiter,* the taxpayer (Jupiter), through its wholly owned subsidiary, owned a 77.5-percent general partnership interest in Randolph Outer Drive Venture (Venture), a limited partnership formed in 1962 to build and develop real estate. Empire Properties (Empire), a limited partner, owned the remaining 22.5-percent interest. In 1965, Venture began actively searching for new capital to repay the amounts Venture owed Jupiter (which totaled approximately $4 million). Although Jupiter sought additional partners as a means of raising capital, it did not want to give up any management control to additional partners.

Venture was reorganized to admit two limited partnerships (the Wilkow Group) into Venture as limited partners.[36] In exchange for a 20-percent limited partnership interest in Venture, the Wilkow Group agreed to make a $1,150,000 contribution to capital and a $3,500,000 loan to Venture. The original partnership agreement between Jupiter and Empire required the consent of both partners before any new partners could be admitted to Venture.[37] After the transaction was completed, Jupiter received $3,431,000 as repayment on its outstanding loan to Venture and approximately $258,000, from Empire as partial repayment of the $500,000 loan.

In the notice of deficiency, the Commissioner treated the admission of the Wilkow Group as a purchase and sale of 20 percent of Jupiter's partnership interest in exchange for

---

[35]For purposes of sec. 731, it was conceded in both the *Jupiter Corp. v. United States,* 2 Cl. Ct. 58 (1983), and *Communications Satellite Corp. v. United States,* 223 Ct. Cl. 253, 625 F.2d 997 (1980), cases, that the amount distributed did not exceed the partner's adjusted basis in the partnership.

[36]To minimize risk, the Wilkow Group desired only a limited partnership interest. The Wilkow Group also sought a secure rate of return on its investment to provide for an income stream to family members.

[37]In order to obtain Empire's consent to such admission, Jupiter made certain concessions, including reorganizing Venture so that no reduction in Empire's proportioned partnership interest occurred, relieving Empire of any obligation to contribute capital necessary to meet the monthly payments to Wilkow Group, and loaning Empire $300,000 which was to be repaid solely out of Empire's proceeds from Venture. As a further inducement, Jupiter granted Empire the right to participate in any future development adjacent to the project.

cash from the Wilkow Group's contribution to capital, and a reduction in Jupiter's liability, from the Wilkow Group's assumption of 20 percent of Venture's mortgage liability.

The Claims Court held that the form of the transaction was consistent with the substance. Placing significant weight on the intent of all the parties (Jupiter, Empire, and the Wilkow Group), the court determined that the intent to reorganize Venture and admit the Wilkow Group, rather than to sell a portion of Jupiter's partnership interest, was reflected in the documents and by the credible and uncontradicted testimony of all the parties.

In contrast to *Jupiter*, the record here is devoid of any specific or concrete testimony regarding the parties' intent in structuring the transaction. Furthermore, the facts indicate that Colonnade selected the particular form of the transaction in order to avoid the tax ramifications of a sale.

Prior to the April 1, 1978, amendment wherein it transferred equal portions of its partnership interest to its three shareholders, Colonnade claimed approximately $2.2 million in tax losses from the Georgia King partnership. These tax losses sheltered Colonnade's profits from its unrelated, successful condominium conversions in Washington, D.C. Upon formation of Georgia King in 1976, most of Colonnade's partnership basis was attributable to its share of nonrecourse liability in an $18,250,000 mortgage held by NJHFA on the Village, a subsidized, low-income housing project in Newark, New Jersey. By 1978, Colonnade's Washington condominium conversions were nearly complete and its profits had declined substantially. Colonnade no longer needed the large losses it had been claiming from Georgia King. In fact, correspondence between Schwartzberg and Feldman relating to projected tax losses manifests that changes in the ownership of Colonnade's partnership interest were contemplated prior to 1977.

Numerous factors distinguish *Jupiter* from the instant case. First, in *Jupiter*, the Wilkow Group's limited partnership interest did not exist prior to the amendment. The newly created interest gave the Wilkow Group priority over the other partners with respect to rights to distributions, and the original general partnership interest, but not the limited partnership interest, imposed an obligation to ad-

vance money beyond the initial contribution and loan. In the instant case, the general partnership interest in Georgia King remained unchanged, but for the owner, and carried the exact same obligations prior to and after the amendment. Only the identities of the obligors were changed— from Colonnade to Bernstein, Feldman, and Mason. Finally, in *Jupiter,* the court concluded that the obligation of Empire to advance moneys to the partnership was eliminated by the amendment, which could not have been accomplished by a sale between Jupiter and the Wilkow Group. *Jupiter Corp. v. United States, supra* at 80. Here no change occurred to the rights and obligations of the other partners by virtue of the amendment. Only the rights and obligations of Colonnade, as transferor, and those of the three individual shareholders were affected.

Likewise, we find the instant transaction distinguishable from that of *Communications Satellite Corp. v. United States, supra.* In that case, Communications Satellite Corp. (COMSAT) was an initial member of the International Satellite Consortium (INTELSAT), an international joint venture (deemed a partnership for tax purposes) which operated a global commercial communications satellite system. The special agreement specified the initial percentage interests (quotas) of the initial members of the partnership based on projected use of the space segment of the INTELSAT system. COMSAT's quota was set at 61 percent.

Partners who subsequently joined INTELSAT paid for their interests according to a formula which provided that a new member paid the amount of "what would have been the member's pro rata share of the total prior capital contributions made by all members of INTELSAT, plus interest which was reduced by what would have been the member's pro rata share of the total prior profits distributions as if it had been a member from the beginning." The effect of the formula was to determine the new member's contribution without any negotiations involving INTELSAT, the Committee, or any partner once the new member's quota was determined. The amount received from the new partner was distributed to the existing partners reflecting the reduction in their percentage interests.

In 1971, six new partners were admitted to INTELSAT. The new partners paid entrance fees totaling $429,598.07 in 1971 and $101,222.30 in 1972. INTELSAT distributed $230,965 in 1971 and $54,748 in 1972 to COMSAT. COMSAT did not report any gain from these transactions.

The Commissioner claimed that COMSAT should have treated these amounts as capital gain. Relying on section 1.731-1(c)(3), Income Tax Regs., which provides an exception to the general rule of section 731 that partnership distributions are not taxable, the Commissioner argued that the payment of admission fees to INTELSAT was a "contribution of property to a partnership" and that the redistribution of that money to the other partners "within a short period of time" was a "distribution" of the "contributed property" to those other partners.

The Court of Claims found that the regulation did not automatically or necessarily require recognition of gain in every situation in which property contributed to a partnership is shortly thereafter distributed to one or more of the partners. The Court of Claims noted that in applying the regulation, substance controls over form. Considering all aspects of the true character of the transactions, the court emphasized "that the arrangements by which new partners joined INTELSAT and the interests of the existing partners were reduced were distributions of partnership property to the existing partners rather than sales by the latter of a portion of their partnership interests to the new partners." 625 F.2d at 1000. The court found particularly significant the fact that the new partners were admitted not for a financial advantage for the original partners, but to further the general objective of extending communications worldwide. Furthermore, there were no financial negotiations by either INTELSAT or the existing partners and there were no contracts of sale between old and new partners. "Neither the partnership nor the existing partners had any control over who joined INTELSAT (other than certain restrictions in the agreements to members of the International Telecommunications Union). * * * The entry fees—the price paid for the partnership interest—had no relationship to the actual value of the new partners' percentage interests in the partnership." 625 F.2d at 1001.

Viewed together, in light of the special nature and purpose of the partnership, the Court of Claims concluded that these arrangements demonstrated characteristics not commonly associated with sales transactions. Unlike the case now before us, *Communications Satellite* involved the furtherance of a specific goal (the objective of extending communications worldwide), rather than the admittance of new partners for a financial or tax advantage.[38]

Petitioner's reliance on *United States v. Stafford,* 727 F.2d 1043 (11th Cir. 1984), is equally misplaced.[39] At issue in *Stafford* was whether a contribution had been made in exchange for the receipt of a partnership interest pursuant to section 721. Respondent here is not challenging the contributions made by the three individuals as a result of the April 1, 1978, amendment. Rather, he is challenging the tax effect of the transfer of a portion of Colonnade's partnership interest by Colonnade to third parties not previously members of the partnership.

---

[38]Although we find the cases of *Communications Satellite Corp. v. United States, supra,* and *Jupiter Corp. v. United States, supra,* to be factually distinguishable, we note that Congress believed that those cases and other cases such as *Otey v. Commissioner,* 70 T.C. 312 (1978), affd. per curium 634 F.2d 1046 (6th Cir. 1980), permitted deferral or avoidance of tax by creating contributions/distributions transactions which economically are indistinguishable from sales. In order to treat such transactions consistent with their underlying substance, sec. 707(a)(2)(B) was added to the Code by sec. 73 of the Tax Reform Act of 1984, 98 Stat. 591. That section provides that under regulations to be prescribed, if money or property is transferred after Mar. 31, 1984, directly or indirectly to a partnership by a partner, and there is a related direct or indirect transfer of money or other property to that partner, or another partner by the partnership, and "the transfers * * * when viewed together are properly characterized as a sale of property," they will be treated either as a transaction between the partnership and the partner not acting in his capacity as a partner, or as a transaction between partners acting other than as members of the partnership. See H. Rept. 98-861 (Conf.) 861 (1984), 1984-3 C.B. (vol. 2) 115; S. Rept. 98-169 225, 231 (1984).

One commentator has suggested that "if the transaction is not between a partner and a partnership, obviously sections 721 and 731 do not apply and the transaction cannot be a contribution and a distribution." Moreover, "if a transaction is properly a sale, it seems axiomatic that it is not a contribution to, and distribution from, a partnership and should not be entitled to partnership treatment even without new section 707(a)(2)(B)." 1 A. Willis, Partnership Taxation, par. 22.05 (3d ed. 1985).

[39]We also find that Rev. Rul. 75-423, 1975-2 C.B. 260, upon which petitioner relies, is inapposite. At issue was whether a transaction where incoming partners were offered 60-percent interest in the partnership in exchange for cash contributions resulted in a termination of the partnership under sec. 708(b). The Service ruled that a termination did not occur within the meaning of sec. 708(b)(1), emphasizing that the transaction took place between new partners contributing new capital and the partnership as a whole. The interests of all the original partners were affected and there was no discharge of obligations of the original partners to pay capital, nor was there a payment of the capital from the new partners to the old partners. Even assuming if Rev. Rul. 75-423, *supra,* was precisely on point, revenue rulings are not binding on this Court. *Estate of Lang v. Commissioner,* 64 T.C. 404, 406-407 (1975), affd. in part 613 F.2d 770 (9th Cir. 1980). See also *Twin Oaks Community v. Commissioner,* 87 T.C. 1233, 1252 (1986), and cases cited therein.

Having concluded that Colonnade's transfer of a portion of its partnership interest to three new partners constituted a sale or exchange, the next issue for our determination is the amount of the taxable gain resulting from this transaction.[40] Under section 741, the amount of gain is measured by the difference between the amount realized and the adjusted basis of the partnership interest, as determined under section 705. Sec. 1.741-1, Income Tax Regs. The original basis of Colonnade's partnership interest acquired by contribution was the amount of such contribution, plus Colonnade's allocable share of partnership liabilities. Secs. 705(a)(1) and 722; secs. 1.705-1(a)(4), 1.722-2, and 1.752-1(a)-(e), Income Tax Regs. As Georgia King continued to operate, Colonnade's basis was reduced by its share of losses. Sec. 705(a)(2).

In determining the amount realized, section 752(d) provides that in the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships. Thus, if a partner sells his partnership interest for cash and, at the same time, transfers to the purchaser his share of the partnership liabilities, the amount realized includes the cash and the amount of the liabilities. Sec. 1.752-1(d), Income Tax Regs.

The amount realized from the sale or other disposition of property includes the amount from which the transferor is discharged as a result of the sale or disposition. *Millar v. Commissioner*, 577 F.2d 212 (3d Cir. 1978), affg. 67 T.C. 656 (1977). Sec. 1.1001-2(c)(1), Income Tax Regs. The liabilities from which a transferor is discharged as a result of the sale or disposition of a partnership interest include the transferor's share of the liabilities of the partnership. Sec. 1.1001-2(a)(4)(v), Income Tax Regs. The fair market value of the property at the time of sale or disposition is not relevant in determining the amount of liabilities discharged. Thus, the fact that the fair market value of the property is less than the amount of the liabilities it secures does not prevent the full amount of the liabilities from being treated

---

[40]For a complete discussion of computation of gain or loss from the disposition of a partnership interest see *Jackson v. Commissioner*, T.C. Memo. 1981-594.

as money received. Sec. 1.1001-2(b), Income Tax Regs. These principles are consistent with the Supreme Court's holding in *Commissioner v. Tufts, supra:*

When a taxpayer sells or disposes of property encumbered by a nonrecourse obligation, the Commissioner properly requires him to include among the assets realized the outstanding amount of the obligation. The fair market value is irrelevant to this calculation. * * * [461 U.S. at 317.]

The computation of long-term capital gain resulting from Colonnade's sale of a 40.98-percent general partnership interest is as follows:[41]

*Adjusted basis of partnership interest at the time of transfer 4/1/78:*

| Capital contributions: | | |
|---|---:|---:|
| 1976 | $195,300 | |
| 1977 | 189,000 | $384,300 |
| Net payments for interest: | | 7,117 |
| Partnership liabilities as of 12/31/77: | | |
| Full recourse loans | 1,065,938 | |
| Non-recourse loans | 17,949,648 | |
| | 746,000 | |
| Total | 19,761,586 | |
| 50.98 percent share of liabilities | | 10,074,456 |
| Total | | 10,465,873 |

Distributable share of partnership losses:[42]

[41]This calculation, which corresponds to respondent's calculation of gain on brief, is slightly higher than that set forth in the notice of deficiency. Because of the de minimis difference, respondent has not sought an increased deficiency amount. Accordingly, $1,454,874, the gain determined in the statutory notice, is the amount of gain in issue.

In its reply brief, petitioner objected to respondent's determination of gain as being contrary to that set forth in the statutory notice of deficiency. However, respondent's calculation of gain on brief more accurately comports with the record in this case. We note that the statutory notice of deficiency contains computational errors, specifically in that it sets forth petitioner's retained liabilities in Georgia King after Apr. 1, 1978, as being 19.165 percent (10 percent is correct) and sets forth distributable losses allocable to the period ending Apr. 1, 1978, as ($133,541), rather than ($135,395). In addition, the statutory notice did not include the DCE account in the amount of total partnership liabilities. As of Dec. 31, 1977 (the closest date to the Apr. 1, 1978, partnership amendment when liabilities are reflected in the record), total partnership liabilities, recourse and nonrecourse were $19,761,586, and included the DCE account. In determining its basis in the partnership, petitioner included the proportionate amount of all liabilities to its partnership interest. Other than perfunctory arguments, petitioner has not cited any authority for the proposition that such account should properly be excluded from the computation of liabilities nor do we find that any exception in sec. 1.1001-2, Income Tax Regs., would apply here.

[42]In the calculation set forth herein, a reduction was not made for the partnership distribution reflected by the reduction of liabilities from the first amendment in 1977, because that reduction of liabilities from the first amendment is already included in the calculation by measuring Colonnade's share of partnership liabilities as of Apr. 1, 1978. Thus, Colonnade's losses reduced its basis in its 50.98-percent interest to $8,262,710, and the basis in the 40.98-percent interest sold was $6,641,935.

| | | |
|---|---|---|
| Reported for 1976 | ($1,096,819) | |
| 1977 | (970,949) | |
| 1/1/78-4/1/78 | (135,395) | ($2,203,163) |
| Adjusted basis of 50.98-percent interest | | 8,262,710 |

*Computation of gain:*

| | |
|---|---|
| Colonnade's share of partnership liabilities | 10,074,456 |
| Less: Share of liabilities retained (10%) | 1,976,158 |
| Liabilities discharged (assumed by shareholder/new partners) | 8,098,298 |
| Adjusted basis of interest transferred: | |
| $\frac{40.98\%}{50.98\%} \times \$8,262,710$ | 6,641,935 |
| | 1,456,363 |

In the instant case, Colonnade was discharged of 40.98 percent of the partnership liabilities by virtue of the sale of its 40.98-percent interest to Bernstein, Feldman, and Mason. The discharged liabilities, both recourse and nonrecourse, amounted to $8,098,298. The amount of gain is $1,456,363, calculated by the amount realized ($8,098,298) over basis ($6,641,935). Although the amount realized through discharged liabilities, primarily nonrecourse, was in excess of fair market value of the interest sold, the gain measured by the amount realized over basis is not limited by the lower fair market value.

To reflect the concessions and the foregoing,

*Decision will be entered under Rule 155.*