JOHN H. OTEY, JR., AND BETTYE G. OTEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1203–76.    Filed May 23, 1978.

*Ervin Entrekin,* for the petitioners.
*Robert B. Nadler,* for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Year | Deficiency |
|------|-----------|
| 1969 | $4,718.87 |
| 1970 | 3,364.20 |
| 1971 | 105.75 |

Due to concessions by petitioners, the sole issue for decision is whether petitioners incurred net operating losses in 1972 which they are entitled to carry back to the years in issue. Resolution of this issue depends upon whether a payment by a partnership to petitioner (a partner) of $64,750 following petitioner's conveyance of real property to the partnership constitutes a sale of the property to the partnership or a contribution of the

property to the partnership followed by a current distribution of $64,750, taxable, if at all, according to section 731.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

At the time they filed their petition, John H. Otey, Jr., and Bettye G. Otey resided in Nashville, Tenn. Bettye is a party only by virtue of having filed joint returns with her husband. When we hereafter refer to petitioner, we will be referring to John.

Petitioner is in the real estate business. In 1963 petitioner inherited from his uncle real property at 2612–14 Heiman Street in Nashville (Heiman Street property). At the time petitioner acquired the property, its fair market value was $18,500. Petitioner took title to the property in joint tenancy with his wife.

The Heiman Street property was located in a blighted or redline area of Nashville. There was in 1970 and 1971 a shortage of multi-family apartment complexes in Nashville. Sometime in 1971 petitioner and Marion Thurman (Thurman), a real estate developer, decided to develop the Heiman Street property into a moderate-income apartment complex, a type of complex for which there was then available FHA-insured financing. On October 19, 1971, petitioner and Thurman formed a partnership under the name of Court Villa Apartments for the purpose of building a 65–unit FHA-insured residential apartment on the Heiman Street property. Thurman, through his construction company, Marion Thurman Builders, was to build the rental units, and petitioner was to manage them.

On December 30, 1971, petitioner and his wife transferred title to the Heiman Street property to the partnership. At the time of the transfer, petitioner's basis in the property was $18,500 and the fair market value of the property was $65,000.[2] This transfer was pursuant to the partnership agreement, which provided:

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

[2] Petitioner and Thurman determined that $65,000 was the fair market value of the property by reference to comparable rental properties in Nashville, which were selling for $1,000 per unit. Since the partnership was to have 65 units, they valued the property at $65,000. In December 1973, the partnership listed its payment for the property as an expense on its "Mortgagor's Certificate of Actual Cost" filed with the Department of Housing and Urban Development; the amount "paid in

John H. Otey, Jr. has contributed the land to the Joint Venture and the parties agree that the said Otey shall draw the first Sixty Five Thousand ($65,000) Dollars of loan proceeds from the Joint Venture as soon as the loan closes. Moreover the parties have together borrowed Fifteen Thousand ($15,000) Dollars from the Third National Bank and opened up a bank account in the name of COURT VILLA APARTMENTS. After the Sixty Five Thousand ($65,000) Dollars has been repaid to Otey, the parties agree that this loan shall be repaid to the Third National Bank.

The agreement further provided that profits and losses would be shared equally. Similarly, withdrawals and distributions of cash were to be made equally, except that as previously noted the first $65,000 of the loan proceeds was to be paid to petitioner.

On January 11, 1972, the partnership obtained a construction loan of $870,300 from the Third National Bank. Both petitioner and Thurman were jointly and severally liable for the loan. Pursuant to the partnership agreement, petitioner was paid $64,750[3] from the loan proceeds in four installments as follows:

| Date | Amount |
|------|--------|
| 1/11/72 | $32,500 |
| 4/14/72 | 10,000 |
| 5/11/72 | 12,250 |
| 6/13/72 | 10,000 |
| | 64,750 |

Marion Thurman Builders built the apartment units for the partnership and was paid by the partnership from the construction loan. Thurman contributed no cash or other assets to the partnership. His contribution was his ability to get financing for the partnership through his good credit. During 1972, 1973, and 1974 the partnership reported losses on its Form 1065 (U.S. Partnership Return of Income).

The partners intended that petitioner's transfer of the Heiman Street property to the partnership was a contribution to the capital of the partnership and not a sale of the property to the partnership. On receipt of the $64,750 cash from the partnership in 1972, petitioner reduced his basis in his capital in the partnership. Since his basis, consisting of his $18,500 basis in

cash" for this property was listed as $64,750. Similarly, in its partnership returns for 1972 through 1976, the partnership listed the value of the land as $64,750. However, several days before trial, the partnership filed amended returns for 1972 through 1976 which listed the value of the land as $18,500.

[3]The joint venture agreement provided that the partnership would pay petitioner $65,000; in fact he received only $64,750. The parties agree that the $250 difference is not material.

the land contributed plus his liability for one-half of the borrowed construction money, exceeded the money distributed to him, he reported no income from this transaction on his 1972 return. Respondent, in his statutory notice, determined that petitioner realized gain from the "sale" of the Heiman Street property to the partnership in 1972 which should have been reported by petitioner on his 1972 return.

## OPINION

Petitioner made a contribution of property worth $65,000 to a partnership of which he was a partner. Within a short period after such contribution, the partnership borrowed funds on which petitioner was jointly and severally liable, and pursuant to agreement distributed $64,750 of such borrowed funds to petitioner, retaining petitioner's property. The distribution of $64,750 did not exceed petitioner's basis in the partnership. The question presented is whether petitioner in reality "sold" his property to the partnership. Respondent, relying on section 707, contends that he did.

Section 707 provides that "If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall * * * be considered as occurring between the partnership and one who is not a partner," and section 1.707–1(a), Income Tax Regs., provides that "In all cases, the substance of the transaction will govern rather than its form."

Petitioner relies on section 721—"No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership"—and section 731—"In the case of a distribution by a partnership to a partner * * * gain shall not be recognized to such partner, except to the extent any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution."

We are cautioned, however, by section 1.731–1(c)(3), Income Tax Regs., as follows:

(3) If there is a contribution of property to a partnership and within a short period:

(i) Before or after such contribution other property is distributed to the contributing partner and the contributed property is retained by the partnership, or

(ii) After such contribution the contributed property is distributed to another partner,

such distribution may not fall within the scope of section 731. Section 731 does not apply to a distribution of property, if, in fact, the distribution was made in order to effect an exchange of property between two or more of the partners or between the partnership and a partner. Such a transaction shall be treated as an exchange of property.

Thus we are faced with the question whether this transaction, which was in form a contribution of property to a partnership followed by a distribution of loan proceeds to the contributing partner, was in substance a sale of the property to the partnership by the partner.

Respondent relies on certain facts which he deems crucial. First, the property, which petitioner inherited from his uncle, was taken by petitioner in joint tenancy with his wife. To convey the property to the partnership, the wife had to join in the conveyance. Since she was not a partner, respondent concludes that at least as to half the real property there must have been a sale. However, since the wife apparently had only a legal title as joint tenant in the property, having contributed nothing to the acquisition, we find this argument unpersuasive. There is no indication in the record that petitioner intended to make a gift of half of the property to his wife and it appears the use of joint tenancy was merely intended as a convenient and customary means of reducing probate costs in the event of petitioner's death prior to his wife's death.

Second, respondent contends that because neither partner contributed any cash to the partnership, and all available cash had to come from borrowing, "it is unconvincing that a partner would withdraw funds for his personal use, when these funds were needed for the project." Respondent also points out that on the Department of Housing and Urban Development Mortgagor's Certificate of Actual Cost, the cost of the land was stated to be $64,750. Respondent then concludes that "considered as a whole, the facts portray a sale of property to the partnership." We disagree.

Subchapter K provides two possible methods of analyzing the transfer by petitioner of his Heiman Street property to the partnership, with sharply divergent tax consequences depending upon which analysis applies. Using the contribution approach, sections 721 and 731 treat a partner's contribution of property to

his partnership as a nonrecognizing transaction, producing neither gain nor loss, and withdrawals from the partnership are treated as reductions in basis rather than as taxable events. If these sections are applicable, we must sustain petitioner, because the immediate recourse borrowing by the partnership would (like most other borrowing) be a nontaxable event, increasing the basis of the parties in their partnership interest under sections 752(a) and 722. The distribution to a partner (petitioner) of part of the borrowed funds would not generate gain but would simply reduce pro tanta the distributee's basis under sections 731(a)(1) and 733.[4] This approach treats petitioner in a manner rather similar to a proprietor. Had petitioner simply decided to use his Heiman Street property as a proprietor for an FHA housing project and had he been able to obtain an FHA construction loan in an amount exceeding the cost of building the proposed structure, and diverted to his personal use $64,750 of the loan, no gain or loss would have been realized. This would be the case even had he been able to borrow the money only by agreeing to pay half his profits over to Thurman for acting as the cosigner on the loan. Sections 721 and 731 parallel this treatment.

But the Code also recognizes that in some cases partners do not deal with a partnership in their capacity as partners. Even though they are personally on both sides of a transaction with the partnership to the extent of their partnership interest, partners may on occasion deal with the partnership in a capacity other than as a partner and must treat such dealings with the partnership accordingly under section 707. This section, among other things, prevents use of the partnership provisions to render nontaxable what would in substance have been a taxable exchange if it had not been "run through" the partnership. For example, respondent has ruled that if two parties contribute to their partnership their equal interest in stock of two corporations and then liquidate the partnership with each taking all of the stock of one corporation, a taxable exchange has occurred. Rev. Rul. 57-200, 1957-1 C.B. 205. See sec. 1.731-1(c)(3)(ii), Income Tax Regs., *supra*. The partnership form may not be

---

[4]Contrast the results should a corporate entity be employed for a similar series of transactions. See sec. 301(c)(3)(A) and sec. 341(a)(3).

employed to evade the limitations in section 1031, and section 707 is the mechanism for guarding this gate.

Neither the Code and regulations nor the case law offers a great deal of guidance for distinguishing whether transactions such as those before us are to be characterized as a contribution (nontaxable) under section 721, as petitioner contends, or as a sale to the partnership other than in the capacity of a partner (taxable) under section 707, as respondent urges. It is at least clear from the above-quoted regulation under section 731 that application or not of section 707 is not always merely elective with a taxpayer. Occasions exist on which he must be thrust unwillingly within it in order for it to serve its above-described prophylactic function. And the regulations provide that "In all cases, the substance of the transaction will govern rather than its form." Sec. 1.707–1(a), Income Tax Regs.

The Code and regulations make more explicit the "ground rules" for the application of section 707 where performance of services by a partner for the partnership is involved as distinguished from a transfer of property. In the case of personal services, the characteristic which distinguishes ordinary distributions taxed under section 731 from "guaranteed payments" taxed under section 707 is the extent to which such payments are determined without regard to the income of the partnership. See sec. 707(c).[4] Section 707 provides no explicit assistance analogous to section 707(c) where transfers of property are involved, but the guaranteed payments provision may provide useful indications of the drafters' intent. However, section 1.721–1(a), Income Tax Regs., does shed some light on the applicable rule. "Thus, if the transfer of property by the partner to the partnership results in the receipt by the partner of money or other consideration, including a promissory obligation fixed in amount and time for payment, the transaction will be treated as a sale or exchange under section 707 rather than as a contribution under section 721."

A few cases have considered whether transfers of property by partners to partnerships were or were not taxable under section 707. In *Davis v. Commissioner*, a Memorandum Opinion of this Court, 29 T.C.M. 749, 39 P-H Memo. T.C. par. 70,170 (1970), the

---

[4]Sec. 707(c) provides:

To the extent determined without regard to the income of the partnership, payments to a partner for services * * * shall be considered as made to one who is not a member of the partnership, * * *

taxpayer transferred land to a joint venture in which he was held to have been a partner. It was agreed that he would be paid for the property with the first available funds and in all events whether the project was a success or failure. In form the transaction was a sale. His 50-percent partner would have been required to put up half the purchase price if the venture could not pay. We there held the transaction was governed by section 707 and not by section 721. The taxpayer recognized long-term capital gain on the sale.

In *Oliver v. Commissioner*, a Memorandum Opinion of this Court, 13 T.C.M. 67, 23 P-H Memo. T.C. par. 54,034 (1954), the taxpayer transferred 40 lots to a partnership in which he owned a 50-percent interest. In form, the transaction was a sale to the partnership, and the taxpayer claimed long-term capital gain treatment. However, the other partner contributed no capital, and the 40 lots constituted the sole capital of the partnership at its inception. We held that in substance the "sale" amounted to a capital contribution to the partnership. The taxpayer's capital account was credited with the taxpayer's cost of the lots and later with the excess of the FHA appraisal over that cost. There was no other partnership capital and had the taxpayer not contributed the lots there would have been no partnership business. While *Oliver* dealt with years preceding the 1954 Code, the issue decided therein of whether the transfer was in substance a sale or a capital contribution is essentially the same as whether section 707 or section 721 should apply under the law applicable to our case.

Willis argues that partners in effect may choose between coming within section 707 or section 721 by the choice they make between substantively identical methods of capitalizing their partnership. He does not construe the "substance of the transaction" language of regulation section 1.707–1(a) as authorizing respondent to recharacterize a transaction which is formally a sale, even if it is merely a method chosen for capitalizing the partnership, in the absence of an attempted end run around section 1031's limitations. 1 A. Willis, Partnership Taxation, secs. 14.08 and 33.07 (2d ed. 1976).

Turning to the facts before us, a number of circumstances militate in favor of a conclusion that section 721 rather than section 707 should govern. In the first place, the form of the transaction was a contribution to capital rather than a sale, and

there are no elements of artificiality in the form selected which should induce us to be particularly astute to look behind it. Without deciding here (because we need not decide) the extent to which Willis is correct in his view that partners may elect to capitalize their partnership under section 707 by employing the necessary formal steps, this partnership clearly did not so elect. Second, and most importantly, the capital in question (borrowed funds aside) was emplaced in the partnership at its inception and as a part of the very raison d'etre of the partnership. Without this transfer, the partnership would have had no assets and no business. It is therefore most difficult for us to agree with respondent that the transaction was between petitioner and the partnership *other than in petitioner's capacity as a partner*. See *Oliver v. Commissioner, supra*. Third, the capital in question was the *only* contributed capital of the partnership. To treat this as an outside transaction would require us to hold in effect that no nonborrowed capital was contributed at all. While such partnerships can of course exist, they are unusual and it would seem very strained to contend that this is such a case. The property had to be in the partnership to make the borrowing possible. Fourth, petitioner enjoyed here no guarantee by the partnership that he would be paid (and get to keep) the $65,000 in all events. Compare *Davis v. Commissioner, supra*. True, most of that sum was distributed to him almost at once out of borrowed funds, but he remained personally liable for the entire borrowing. Accordingly, we do not consider the transaction to be one described in section 1.721–1(a), Income Tax Regs., resulting "in the receipt by the partner of money or other consideration, including a promissory obligation fixed in amount and time for payment," and causing applicability of section 707. Provisions for preferential distributions out of borrowed funds to restore capital accounts to equality after non-pro rata partnership contributions do not necessarily demonstrate that the contributions were really sales. An important feature distinguishing transfers in the capacity of a partner from section 707 transactions is whether payment by the partnership to the partner is at the risk of the economic fortunes of the partnership. In the present case, whether partnership cash flow would ever suffice to repay the distributed $64,750 to the bank would depend on the partnership's subsequent economic fortunes. If they were adverse, petitioner could be called on to repay the loan himself. Fifth, the

pattern here is a usual and customary partnership capitalization arrangement, under which the partner who put up a greater share of the capital than his share of partnership profits is to receive preferential distributions to equalize capital accounts. The only unusual feature here is the immediate availability of the equalizing distribution out of excess borrowed funds. The normality of this general pattern would make it most unsettling were we to accept respondent's invitation to recharacterize the capitalization of the partnership on account thereof. Finally, although respondent relies briefly on the early cash distribution to petitioner of the excess borrowed funds, this payment does not constitute the kind of attempted end run around the limitations of section 1031 which the regulations properly seek to block. Were there no partnership at all, a taxpayer could borrow funds on the security of appreciated property and apply them to his personal use without triggering gain. Had the distributed funds come directly from the other partner, respondent's case would be stronger. While it may be argued that the funds have come indirectly from Thurman because his credit facilitated the loan, the fact is that the loan was a partnership loan on which the partnership was primarily liable, and both partners were jointly and severally liable for the full loan if the partnership defaulted. We do not view the factual pattern here as constituting a disguised sale of the land to Thurman or the partnership. For all the above reasons, we cannot sustain respondent in his attempted recharacterization of the transfer as a sale.

Respondent also places reliance upon the fact that the cost of the land transfer was stated to be $64,750 in cash in documents filed with the FHA. We do not view this as particularly significant since we do not believe that the implied "sale" label so affixed is determinative. To the extent labels are important, the label used in the partnership agreement itself is far more significant as an indication of the parties' true intent as between themselves.

We hold that the transfer constituted in substance what it was in form—the initial capitalization of the partnership. The early withdrawal of borrowed cash in an amount substantially equivalent to the agreed value of the contributed property

reduced petitioner's basis in the partnership but did not create income to him. Secs. 731(a)(1) and 733.

*Decision will be entered under Rule 155.*