## COMMUNICATIONS SATELLITE CORPORATION

v.

## The UNITED STATES.

### No. 155–78.

United States Court of Claims.

April 2, 1980.

Harold J. Heltzer, Washington, D. C., attorney of record, for plaintiff. Crowell & Moring, Washington, D. C., of counsel.

Bruce W. Reynolds, with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr. and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and NICHOLS, Judge.

### OPINION

FRIEDMAN, Chief Judge.

The plaintiff in this case is a member of the International Telecommunications Satellite Consortium (INTELSAT), an international joint venture (deemed a partnership for federal tax purposes) that operates a global commercial communications satellite system. The issue is the federal tax treatment of certain monetary distributions made by INTELSAT to its members, including the plaintiff, reflecting payments by new members required for admission to the partnership. The plaintiff contends that these payments were distributions of partnership assets, which do not require recognition of gain; the government, on the other hand, argues that these transactions were the sale of part of the plaintiff's interest in the partnership, the gain on which is recognized. All relevant facts have been

stipulated, and we have heard oral argument. We conclude that the payments to the plaintiff were distributions by the partnership and not the proceeds of a sale of a partnership interest, and accordingly we hold for the plaintiff.

## I.

A. In 1961, the United Nations adopted the principle that satellite communications should be made available on a nondiscriminatory basis to all nations of the world as soon as practicably possible. G.A.Res.1721, 16(1) U.N.GAOR, Supp. (No. 17) 6, 7, U.N. Doc. A/5100 (1961). The plaintiff, a private District of Columbia corporation, was created pursuant to the Communications Satellite Act of 1962, 47 U.S.C. §§ 701–744 (1976), to implement this policy on behalf of the United States and to provide the United States' participation in such a satellite system. *Id.* § 701(c). Congress declared that this system would be "responsive to public needs and national objectives, [would] serve the communication needs of the United States and other countries, and [would] contribute to world peace and understanding." *Id.* § 701(a).

In 1964, delegates of governments and telecommunications entities representing 85 percent of the world telecommunications traffic met in Washington, D. C., in order to establish a global commercial communications satellite system. At the conclusion of this conference on August 20, 1964, an Interim Agreement, signed by the government of each country, and a Special Agreement, signed by each government or its designee, were opened for signature. 15 U.S.T. 1705, T.I.A.S. No. 5646, 514 U.N.T.S. 25. These agreements provided for the establishment of INTELSAT and detailed its structure and operating procedures. The United States government was an initial signatory of the Interim Agreement, and the plaintiff, as the designee of the United States, was an initial signatory of the Special Agreement and therefore an initial member of INTELSAT.

The Special Agreement specified the initial percentage interests, called "quotas," of the initial members of the partnership based on projected use of the space segment of the INTELSAT system.[1] The plaintiff's quota was set at 61 percent. Each member was required to make an initial capital contribution toward the development of the space segment based pro rata on its quota, and would own an undivided share of the space segment on the same basis. Profits and operating deficiencies were also to be divided according to each partner's quota.

Membership in INTELSAT was originally open to 19 specified governments or designees (those whose quotas were set in the Special Agreement), who could accept membership by executing the agreements within 6 months of August 20, 1964. Other members of the International Telecommunications Union, an international agency with approximately 150 member nations responsible for regulating international telecommunications, were entitled to join the venture during this period on the same basis as the original signatories of the agreements and afterward by accession to the agreements. The Interim Communications Satellite Committee, which administered INTELSAT,[2] would determine the quota for each new member also on the basis of anticipated use of the system. Upon admission,

---

1. The space segment was defined as "the communications satellites and the tracking, control, command and related facilities and equipment required to support the operation of the communications satellites." The government conceded at oral argument that the space segment is a partnership asset. The earth stations used to receive satellite transmissions, however, are owned and operated by individual communications entities, although INTELSAT regulates their access to the space segment.

2. The Committee was given "responsibility for the design, development, construction, establishment, maintenance and operation of the space segment of the system and, in particular, [would] exercise the functions and have the powers set forth in the [the Interim] Agreement and in the Special Agreement." Each INTELSAT partner or combination of partners with a quota or quotas of at least 1.5 percent was given one representative on the Committee with a vote proportionate to the quota or quotas represented.

the name of each new member and its quota would be deemed inserted into the agreements. At that time, the quotas of all other members would be reduced pro rata to reflect the quota assigned the new member.

Partners who thus subsequently joined INTELSAT by accession paid for their interests according to a formula the Committee devised. Under this formula, a new member paid the amount of "what would have been the member's pro rata share of the total prior capital contributions made by all members of INTELSAT, plus interest thereon . . . reduced by what would have been the member's pro rata share of the total prior profits distributions made by INTELSAT to its members, plus interest thereon." The effect of this formula was to place each new partner in essentially the same position with respect to capital contributions and profits distributions as if it had been a member from the beginning.

This method was used because of "uncertainties in attempting to value INTELSAT's assets and operations at any specific stage of development or operation." Once the Committee evaluated the new member's projected use of the system and set its quota, the effect of the formula was to determine the new member's contribution without any negotiations involving INTELSAT, the Committee, or any partner. INTELSAT then distributed the amount received from the new partner to the existing partners to reflect the reduction in their percentage interests.

B. This suit arises out of the admission of six new members [3] to INTELSAT in 1971 and 1972, their payment of entrance fees totalling $429,598.07 in 1971 and $101,222.30 in 1972, and INTELSAT's distribution to the plaintiff of $230,965 in 1971 and $54,748 in 1972 to reflect the plaintiff's reduced

quota, all in accord with the agreements described above. The net difference between the amount the plaintiff received and its tax basis in the portion of its quota given up was $24,796 in 1971 and $5,706 in 1972. On its returns for those years, the plaintiff did not report any gain from these transactions.

The Commissioner assessed a deficiency against the plaintiff, claiming, *inter alia*, that it should have treated these amounts as capital gain. The plaintiff paid the deficiency, and filed a claim for refund of that part of the deficiency relating to these distributions.[4] The claim was denied, and this suit timely filed thereafter.

## II.

A. Under the Internal Revenue Code, transfers of money and other property between a partnership and its members generally do not result in recognizable gain or loss.[5] If the payments from new partners to INTELSAT and then from INTELSAT to the plaintiff and other existing partners are viewed as two separate transactions (which is how the agreements structured them), this principle covers them. Section 721 (now section 721(a)) provides that gain or loss is not recognized through contributions of property to a partnership in exchange for partnership interests, such as the admission payments made to INTELSAT. Moreover, under section 731(a), "[i]n the case of a distribution by a partnership to a partner—(1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution." (Since the plaintiff's adjusted basis in INTELSAT exceeded the amounts received, this exception is inapplicable.)

---

3. Mauritania, the Malagasy Republic, Gabon, Ghana, and Costa Rica in 1971, and Barbados in 1972.

4. The parties stipulated that $31 from 1971 and $5 from 1972 "were in excess of Plaintiff's partnership basis with respect to certain depreciable property, [are] properly treated as ordinary income and [are] not contested herein."

5. This general principle is limited by the requirement that the partner engage in such transactions with the partnership as a member of the partnership. I.R.C. § 707(a); Treas.Reg. § 1.707–1(a) (1956).

Under this section, distributions by partnerships to partners include cash payments to the partners that reduce their percentage partnership interests. *See* 2 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners ¶ 19.02[2] (1977).

The government contends, however, that the admission payments and the distributions to the plaintiff that followed together constituted the sale of part of the plaintiff's partnership interest. If this were so, the distributions, as proceeds of that sale, would not be nontaxable under section 731. Instead, section 741 would govern. It provides that "[i]n the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset . . . ."

■ The government relies on Treas.Reg. § 1.731–1(c)(3) (1956), which provides an exception to the general rule of section 731 that partnership distributions are not taxable:

If there is a contribution of property to a partnership and within a short period:

(i) Before or after such contribution other property is distributed to the contributing partner and the contributed property is retained by the partnership, or

(ii) After such contribution the contributed property is distributed to another partner,

such distribution may not fall within the scope of section 731. Section 731 does not apply to a distribution of property, if, in fact, the distribution was made in order to effect an exchange of property between two or more of the partners or between the partnership and a partner.

Such a transaction shall be treated as an exchange of property.

The government contends that the payment of admission fees to INTELSAT was "a contribution of property to a partnership," and that the redistribution of that money to the other partners, "within a short period" thereafter, was a distribution of "the contributed property" to those other partners.

But this regulation does not automatically or necessarily require recognition of gain in every situation in which property contributed to a partnership is shortly thereafter distributed to one or more of the partners. The regulation states only that such distributions "may" not be within the scope of section 731.[6] In applying the regulation, substance controls over form (*see* Treas.Reg. § 1.707–1(a) (1956)). To determine the substance of the transactions, we consider all of their aspects that shed any light upon their true character. *Cf. Otey v. Commissioner*, 70 T.C. 312 (1978), *appeal filed*, No. 79–1183 (6th Cir. Mar. 26, 1979).

B. The substance of the transactions is that the arrangements by which new partners joined INTELSAT and the interests of the existing partners were reduced were distributions of partnership property to the existing partners rather than sales by the latter of a portion of their partnership interests to the new partners.

As stated in the United Nations resolution, in the statute establishing the plaintiff, and in the Interim Agreement, the purpose of the nations of the world in forming INTELSAT was to provide global access to satellite communications. The arrangements reflected considerations of international comity in cooperation rather than the commercial interests customarily involved in organizing a partnership to operate a business venture. This purpose and

---

**6.** An example of the type of transaction that the regulation covers is given in Rev.Rul. 57–200, 1957–1 Cum.Bull. 205. *The ruling deals with a situation in which two people each owned half of a partnership and each owned half of two corporations. Each of the partners contributed his half-interest in the two corporations to the partnership, and the partnership thereafter distributed one of the two corporations to each of the partners along with a* liquidating distribution of half of the partnership itself. These transfers "constituted steps *in an integral transaction entered into for the purpose of effecting an exchange of the corporate stock interests between the partners without the recognition of gain to the partners or the partnership. Accordingly, to such extent, section 731 of the Code does not apply . . ." Id.* at 206. *See also* 1 A. Willis, Partnership Taxation § 33.07 (2d ed. 1976).

this approach are reflected in the provisions governing the admission of new partners.

The preamble to the Interim Agreement expresses the intention of the initially-represented nations to "improve[ ] [the] global communications network" and "expand[ ] telecommunications services to all areas of the world." These nations hoped thereby to "contribute to world peace and understanding," to "benefit . . . all nations of the world," and to supply "the most efficient and economical service possible consistent with the best and most equitable use of the radio spectrum."

These goals could be achieved only if there was easy access to INTELSAT for all who wanted to join in the future. The original partners of INTELSAT undertook to admit new members not because they believed such admission would be financially advantageous to them, but in order to further the general objective to extend access to the communications satellite network as broadly as possible.

The effect of the arrangements for admitting new partners was to eliminate the possibility that gains from the reduction of the existing partner's interests resulting from the admission of new partners would influence decisions on admitting new partners. Moreover, these arrangements exhibited in several important respects characteristics not commonly associated with sale transactions.

There were no financial negotiations with the incoming partners by either INTELSAT or the existing partners, and there were no contracts of sale between old and new partners. Neither the partnership nor the existing partners had any control over who joined INTELSAT (other than the restriction in the agreements to members of the International Telecommunications Union) or over the terms under which the new partners joined. The entry fees—the price paid for the partnership interests—had no relationship to the actual value of the new partners' percentage interests in the partnership; there was no attempt at appraising the value of partnership interests at any time. The entry fees were determined mechanically, based not on the fair market value of the partnership or its assets but on the original capitalization of the partnership. Although the Committee had an opportunity to affect the entry fees through its role in setting the incoming quotas, this power was restricted by the requirement that the quotas reflect only the anticipated use of the system and not the business or investment goals of any partner or the partnership.

Although none of these characteristics individually may establish that the transactions were not sales, their combined effect, viewed in the context of the unique and special nature and purpose of this partnership, is inconsistent with the view that the transactions by which new partners were admitted were sales by the existing partners of part of their interests. To the contrary, the receipt by the existing partners of their pro rata share of the amounts paid by new partners to the partnership were distributions of partnership property on which, under section 731, no gain is recognized.

### CONCLUSION

Since the distributions from INTELSAT to the plaintiff were distributions of partnership property, the plaintiff is entitled to recover. The case is referred to the Trial Division to determine the amount of recovery pursuant to Rule 131(c).