RICHARD O. JACOBSON AND CHERYL H. JACOBSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LAWRENCE E. LARSON AND DONNA C. LARSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5866-87, 6286-87.   Filed April 2, 1991.

*Carlton T. King* and *Kelly L. McCarty,* for the petitioners.
*Michael L. Boman,* for the respondent.

PARR, *Judge:* Respondent determined that petitioners in these consolidated cases were liable for the following deficiencies in their joint Federal income tax:

| Petitioners | Docket No. | Calendar year | Deficiency |
|---|---|---|---|
| Richard O. Jacobson and Cheryl H. Jacobson | 5866-87 | 1982 | $202,604 |
| Lawrence E. Larson and Donna C. Larson | 6286-87 | 1982 | 78,083 |
| | - - - | 1983 | 1,304 |

With the Court's permission, respondent amended his answer in docket No. 5866-87 to include a concession and to correct certain computational errors contained in the notice of deficiency. The effect of respondent's amendment to his answer was to increase the amount of the deficiency in docket No. 5866-87 from $202,604 to $227,524.

After concessions, the remaining issues for decision are: (1) Whether the transfer of certain property in return for a partnership interest followed by a cash distribution should be treated as (a) a contribution to capital under section 721[1] followed by a distribution under section 731, or (b) as a contribution to capital and a partial sale of the property; and (2) whether and to what extent petitioners must recapture investment tax credits on the transfer of section 38 property to the partnership under section 47.

### FINDINGS OF FACT

Many of the facts have been stipulated and are found accordingly. The stipulation of facts and related exhibits are incorporated herein by this reference.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

At the time they filed their petitions with the Court, petitioner Richard O. Jacobson (Mr. Jacobson) and petitioners Lawrence E. Larson (Mr. Larson) and Donna C. Larson resided in Iowa, and petitioner Cheryl H. Jacobson resided in California.

Jacobson Warehouse Co. (JWC) was a general partnership organized under Iowa law, with its principal place of business in Des Moines, Iowa. JWC was involved in the businesses of public warehousing, real estate development, and leasing warehouse space. Messrs. Jacobson and Larson were partners in JWC, and their distributive shares of profits and losses were 75 percent and 25 percent, respectively.

Sometime before 1982 JWC constructed three buildings on a 33.07-acre tract of land abutting McDonald Avenue in Des Moines, Iowa (McDonald properties). The respective sizes of the buildings were 263,196 square feet, 177,431 square feet, and 164,081 square feet. In early 1982 at least 60 percent of the space was leased, and the remainder was utilized in JWC's public warehousing business.

For about 2 years leading up to July 1982, JWC had attempted to find a suitable buyer for the McDonald properties. In late 1981 Mr. Jacobson was introduced to representatives of the Metropolitan Life Insurance Co. (Metropolitan) by two mortgage bankers from Banco Mortgage Co. (Banco). Metropolitan was and is a large insurance company with its principal office in New York, New York. Banco was paid a brokerage fee of $250,000 for making the introduction and arranging the transaction that followed.

On or about February 24, 1982, JWC submitted to Metropolitan a proposal for the formation of a joint venture. On July 8, 1982, JWC accepted the terms of an agreement styled "Commitment from Metropolitan Life Insurance Company to Jacobson Warehouse Company" (commitment). The commitment essentially provided that, if specified conditions were met, Metropolitan and JWC would form a partnership by making capital contributions of up to $6,030,000 and the McDonald properties and improvements (subject to two preexisting mortgages), respectively. Both JWC and Metropolitan received advice from tax profession-

als in planning the transaction. Section 4.05 of the commitment states:

All amounts contributed by [Metropolitan] and [JWC] pursuant to this Article IV of the [partnership] Agreement shall be applied only in payment of proper costs and expenses of the Venture, except that Five Million Nine Hundred Forty-Four Thousand Ten Dollars and 58/100 Dollars ($5,944,010.58) of [Metropolitan's] initial capital contribution may be withdrawn by [JWC].

Also on July 8, 1982, JWC and Metropolitan executed an agreement to form a general partnership under Iowa law known as the Metropolitan Jacobson Development Venture (venture). The purpose and scope of the venture was limited strictly to the acquisition, development, leasing, sale, operation, and management of the McDonald properties for the production of income, unless otherwise approved by JWC and Metropolitan. The agreement provided that Metropolitan and JWC were to make the initial capital contributions required under the commitment. The agreement also required additional capital contributions in proportion to each partner's "ownership percentage interest" to the extent the venture's funds may later prove to be insufficient to satisfy its obligations as they fall due.

The ownership percentage interests of Metropolitan and JWC were 75 percent and 25 percent, respectively. The term "ownership percentage interests" was defined as each partner's undivided interest in and share of the venture's assets, liabilities, profits, and losses for book purposes. All income, gain, loss, deduction, and credit was to be allocated between the partners for income tax purposes in accordance with their ownership percentage interests, except for certain special allocations of depreciation, amortization, and gain. All distributions to partners were also to be made in accordance with their ownership percentage interests, except when a partner fails to make any required additional contributions or as otherwise provided for in the commitment.[2] The partnership agreement also stated that the venture shall file an election under section 754.

---

[2]Sec. 4.01(a) of the partnership agreement states in part:

Except as otherwise provided in Section 4.02(d) hereof [regarding the failure to make additional contributions] and *Section 4.06 of the Commitment,* all distributions * * * shall be made to the Venturers in accordance with their Ownership Percentage Interests. [Emphasis added.]

On July 8, 1982, JWC entered into an agreement to lease back a portion of the McDonald properties from the venture for a period of 3 years at a base rent of $53,126.25 per month, plus its pro rata share of certain costs. JWC leased the building space for the purpose of continuing to operate its general public warehousing business.

Under the partnership agreement, JWC agreed to serve as manager of the venture. JWC received a management fee in the amount of 2½ percent of all base rentals received by the venture during the period JWC was performing such services, but not including any base rentals paid pursuant to the lease between JWC and the venture.

Later on July 8, 1982, JWC conveyed the McDonald properties to the venture by warranty deed and Metropolitan transferred $5,994,010.58 to the venture. The agreed upon value of the McDonald properties was $15 million, and JWC was required to provide title insurance in such amount. The amount of $5,994,010.58 represented the sum of $6,027,233 less certain offsets for prepaid rents and for accrued interest on the two preexisting mortgages on the McDonald properties. On the same day, the entire sum of $5,994,010.58 was withdrawn from the venture's bank account and transferred to JWC and/or its partners, Messrs. Jacobson and Larson.

On its return for the taxable year ended October 31, 1982, JWC reported its transfer of the McDonald properties (subject to the two mortgages) to the venture as a nontaxable capital contribution, and recognized gain on the later cash distribution from the venture to the extent that it exceeded JWC's adjusted basis in its partnership interest in the venture. The amount of the reported gain recognized was computed as follows:

| | |
|---|---|
| Adjusted basis of McDonald properties | $5,983,663 |
| Less: Relief of liabilities on contribution (75% times $6,963,689) | 5,222,767 |
| Basis of JWC's partnership interest | 760,896 |

\* \* \* \* \* \* \*

Sec. 4.06 of the commitment, however, is a "hold harmless" provision and does not address the question of distributions. It is sec. 4.05 of the commitment (as reproduced *supra* p. 580) that addresses JWC's authority to withdraw $5,944,010.58 of its initial capital contribution. Accordingly, it appears that sec. 4.01(a) of the partnership agreement erroneously refers to sec. 4.06 of the commitment, instead of sec. 4.05 of the commitment.

```
Cash contributed by Metropolitan ...........................  6,027,233
Less: Expenses of sale .......................................   528,509
Net cash distributed ........................................  5,498,724
Less: Basis of JWC's partnership interest.....................   760,896
Gain recognized .........................................  4,737,828
```

Petitioners reported their distributive shares of the gain recognized. The parties have stipulated that the adjusted basis of the McDonald properties is $6,002,844 and not $5,983,663 as reported by JWC. If the stipulated adjusted basis is substituted for the reported adjusted basis in the above computation, the net effect is to reduce gain recognized from $4,737,828 to $4,718,647.

In his notices of deficiency, respondent determined that the transactions should be treated as a nontaxable capital contribution of 25 percent of the McDonald properties in exchange for a 25-percent partnership interest in the venture, and a taxable exchange of 75 percent of the McDonald properties for cash. Accordingly, respondent computes the amount of gain recognized as follows:

```
Cash contributed by Metropolitan ...........................  $6,027,233
Relief of liabilities (75% times $6,963,689)....................   5,222,767
Amount realized ........................................  11,250,000
Less: Adjusted basis of McDonald properties
    (75% times $6,002,844).................................   4,502,133
Gross profit ............................................  6,747,867
Less: Expenses of sale ....................................    528,510
Gain recognized .......................................  6,219,357
```

The venture attached a signed "Election Pursuant To Treasury Regulation §1.754-1" to its return for the partial year ended December 31, 1982, wherein it was stated that the venture "hereby elects under I.R.C. §754 to apply the provisions of I.R.C. §743(b)."[3]

The financial statements of JWC for the years ended October 31, 1982 and 1981, which contained the unqualified

---

[3] A taxpayer may elect under sec. 754 to adjust the basis of partnership property ·to the extent gain or loss is recognized to a partner upon the distribution of property or the transfer of a partnership interest. The manner of making such an adjustment after a distribution and transfer of a partnership interest is provided in secs. 734 and 743, respectively. Accordingly, it appears that JWC's election under sec. 754 erroneously refers to sec. 743. Respondent has pointed this flaw out to the Court, but we fail to see the relevancy of this error to the issues before us.

opinion of an independent accounting firm, included the
following note to explain the transactions:

On July 8, 1982, the Partnership sold a 75% interest in a warehouse
complex with a net book value of $4,379,220 to Metropolitan Life
Insurance Company. Metropolitan contributed its interest in the complex
and Jacobson Warehouse Company contributed its remaining 25%
interest in the complex to a new general partnership which assumed from
Jacobson Warehouse Company notes payable of $6,963,689 related to the
warehouse complex. Jacobson Warehouse Company received $6,027,233 in
cash from Metropolitan Life Insurance Company and recognized gain of
$6,343,271 as a result of the transaction.

In contrast, the financial statements of the venture for the
partial year ended December 31, 1982, which also contained
the unqualified opinion of an another independent account-
ing firm, treated the transactions as a contribution and
distribution of capital and not as a part sale of the
McDonald properties.

OPINION

## I. *Treatment of Partnership Contribution and Distribution*

Messrs. Jacobson and Larson were general partners of
JWC, which in turn owned the McDonald properties. JWC
actively tried to sell the McDonald properties outright for
about 2 years before forming a partnership with Metropoli-
tan. JWC contributed the McDonald properties having a net
agreed value of $8,036,311 ($15 million less $6,963,689 in
mortgages) and Metropolitan contributed $6,027,233 in
cash. This amount of cash equals 75 percent of the net
agreed value of the McDonald properties ($6,027,233/
$8,036,311 = 75%). On the same day, all of the cash was
then distributed to or for the benefit of JWC. JWC recog-
nized gain on the distribution, but only to the extent that
the distribution was greater than the adjusted basis of its
partnership interest. The venture then elected under section
754 to increase the adjusted basis of the McDonald
properties by the amount of gain recognized by JWC upon
the cash distribution. When the dust finally settled, Metro-
politan owned 75 percent in the venture and JWC owned 25
percent, and the venture had increased its depreciable basis
in the McDonald properties.

Petitioners argue that the transfer of the McDonald properties to the venture was a nontaxable capital contribution under section 721, and that section 731 requires that gain be recognized only to the extent the amount of cash distributed exceeded the adjusted basis of JWC's partnership interest in the venture. Respondent argues that the transaction should be treated as a nontaxable capital contribution of 25 percent of the McDonald properties in exchange for a 25-percent partnership interest in the venture, and a taxable sale of 75 percent of the McDonald properties for cash.

Section 721(a) provides that no gain or loss is recognized by a partner or a partnership when the partner contributes property to the partnership in exchange for a partnership interest. Section 731(a)(1) provides that a partner recognizes gain in the case of a distribution by a partnership only to the extent the amount of any money distributed exceeds the adjusted basis of the partner's interest in the partnership. No gain or loss is recognized by a partnership upon the distribution of money to a partner. Sec. 731(b).

The nonrecognition of gain treatment provided by sections 721 and 731, however, does not apply to the sale of property between partners, or between a partner and his partnership. Under section 1001(c), a taxpayer must generally recognize all gain or loss realized upon the sale or exchange of property. A taxpayer recognizes gain on the sale of property to another partner, even though that other partner immediately contributes the purchased property to the partnership. See *Barenholtz v. Commissioner*, 77 T.C. 85 (1981), discussed *infra*. As to sales between a partner and his partnership, section 707(a) provides that if a partner engages in a transaction with a partnership, other than in his capacity as a partner, the transaction will be treated as occurring between the partnership and one who is not a partner.

In the present case, it is unclear whether respondent is arguing that there was in substance a sale between JWC and the venture *or* between JWC and Metropolitan. Respondent's argument is unclear because, while respondent relies upon section 707(a) as requiring sale treatment, he also argues inconsistently that, in substance, JWC sold a 75-percent

interest in the McDonald properties to Metropolitan. Accordingly, we will consider both alternatives.

The regulations discuss the interplay between sections 721 and 731 and section 707:

Section 721 shall not apply to a transaction between a partnership and a partner not acting in his capacity as a partner since such a transaction is governed by section 707. Rather than contributing property to a partnership, a partner may sell property to the partnership or may retain the ownership of property and allow the partnership to use it. In all cases, the substance of the transaction will govern, rather than its form. See paragraph (c)(3) of §1.731-1. Thus, if the transfer of property by the partner to the partnership results in the receipt by the partner of money or other consideration * * * the transaction will be treated as a sale or exchange under section 707 rather than as a contribution under section 721. * * * [Sec. 1.721-1(a), Income Tax Regs.]

See also sec. 1.707-1(a), Income Tax Regs. Paragraph (c)(3) of section 1.731-1 of the regulations states that:

If there is a contribution of property to a partnership and within a short period:

(i) Before or after such contribution other property is distributed to the contributing partner and the contributed property is retained by the partnership, or

(ii) After such contribution the contributed property is distributed to another partner,

such distribution may not fall within the scope of section 731. Section 731 does not apply to a distribution of property, if, in fact, the distribution was made in order to effect an exchange of property between two or more of the partners or between the partnership and a partner. Such a transaction shall be treated as an exchange of property.

This Court has already decided a trilogy of cases which have required us to consider whether given transactions fall within the scope of sections 721 and 731 or section 707(a): *Otey v. Commissioner*, 70 T.C. 312 (1978), affd. per curiam 634 F.2d 1046 (6th Cir. 1980); *Barenholtz v. Commissioner*, *supra*; and *Park Realty Co. v. Commissioner*, 77 T.C. 412 (1981). This Court, the former Court of Claims, and the Claims Court have also decided cases which have required a similar inquiry into whether given transactions fall within

the scope of sections 721 and 731 or section 741:[4] *Colonnade Condominium, Inc. v. Commissioner,* 91 T.C. 793 (1988); *Communications Satellite Corp. v. United States,* 223 Ct. Cl. 253, 625 F.2d 997 (1980); *Jupiter Corp. v. United States,* 2 Cl. Ct. 58 (1983).

The seminal case in the trilogy was *Otey v. Commissioner, supra.* In *Otey,* one of the taxpayers formed a partnership with another party for the purpose of constructing FHA-financed housing on property owned by the taxpayer. The taxpayer transferred the property to the partnership at an agreed value of $65,000, and the other party contributed no capital, but his credit worthiness was essential to obtaining a construction loan. The partnership took out a loan in an amount greater than needed for the construction, of which the taxpayer would draw about $65,000. We held that the taxpayer's transfer of property to the partnership was, in substance and in form, a contribution to capital under section 721(a), and not a taxable sale to the partnership under section 707(a).

The next case in the trilogy was *Barenholz v. Commissioner, supra.* In *Barenholz,* one of the taxpayers agreed to sell undivided one-fourth interests in real property to each of three individuals with whom he intended to form a partnership for the operation of the property. Thereafter, the partnership was formed, the interests were sold, and title to the property was transferred to the partnership. Respondent's primary argument was that the taxpayer sold an undivided one-fourth interest in the property to each of his partners followed by a contribution of the property to the partnership by the partners. Respondent's alternative argument was that the transaction should be considered as occurring between the partnership and one who is not a partner, under section 707(a). We agreed with respondent's primary argument and held that the form and substance of the transaction was a sale *between partners.*

---

[4]SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, *except as otherwise provided in section 751 (relating to* unrealized receivables and inventory items which have appreciated substantially in value).

The final case in the trilogy was *Park Realty Co. v. Commissioner, supra.* In *Park Realty,* the taxpayer had begun to incur costs in developing land it owned into a shopping center, and negotiated tentative agreements whereby certain retailers would occupy the center as anchor stores. The taxpayer was unable to obtain adequate financing to complete construction, so it formed a partnership with an affiliate of a large developer, and the taxpayer transferred its interest in the property to the partnership. Pursuant to the partnership agreement, the taxpayer was paid a specified amount as reimbursement for its previously incurred development costs upon consummation of binding agreements with the anchor stores. We held that the taxpayer's transfer of property to the partnership was a nontaxable contribution of property under section 721, and not a sale from the taxpayer to the partnership under section 707(a).

Congress expressed its disapproval of our decision in *Otey* by enacting section 707(a)(2)(B)[5] as part of the Deficit Reduction Act of 1984, which was generally effective for property transferred after March 31, 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 73, 98 Stat. 591-593, as amended by sec. 1805(b), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2810. After discussing sections 1.721-1(a) and 1.731-1(c)(3) of the regulations (set forth in part above), the legislative history states:

The [regulations] may not always prevent de facto sales of property to a partnership or another partner from being structured as a contribution to the partnership, followed (or preceded) by a tax-free distribution from, the partnership. * * * Case law has permitted this result, despite the

---

[5](2) TREATMENT OF PAYMENTS TO PARTNERS FOR PROPERTY OR SERVICES.—Under regulations prescribed by the Secretary—

    \*      \*      \*      \*      \*      \*      \*

(B) TREATMENT OF CERTAIN PROPERTY TRANSFERS.—If—
    (i) there is a direct or indirect transfer of money or other property by a partner to a partnership,
    (ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and
    (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,
such transfers shall be treated either as a transaction described in paragraph (1) [i.e., a transaction between a partnership and a partner not in his capacity as a partner] or as a transaction between 2 or more partners acting other than in their capacity as members of the partnership.

regulations described above, in cases which are economically indistinguishable from a sale of all or part of the property. *See Otey v. Commissioner,* 70 T.C. 312 (1978), *aff'd per curiam* 634 F.2d 1046 (1980); *Communications Satellite Corp. v. United States,* 223 Ct. Cl. 253 (1980); *Jupiter Corp. v. United States,* No. 83-842 (Ct. Cl. [sic] 1983).

\* \* \* \* \* \* \*

Reasons for Change

\* \* \* \* \* \* \*

In the case of disguised sales, the committee is concerned that taxpayers have deferred or avoided tax on sales of property (including partnership interests) by characterizing sales as contributions of property (including money) followed (or preceded) by a related partnership distribution. Although Treasury regulations provide that the substance of the transaction should govern, court decisions have allowed tax-free treatment in cases which are economically indistinguishable from sales of property to a partnership or another partner. The committee believes that these transactions should be treated in a manner consistent with their underlying economic substance.

[S. Print 98-169, Vol. I, at 225 (1984); H. Rept. 98-432, at 1218 (1984).]

See Staff of the J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 231-233 (J. Comm. Print); H. Rept. (Conf.) 98-861, at 861 (1984).

Respondent acknowledges that section 707(a)(2)(B) does not apply to this case, since it became effective for transfers of property occurring after the year in issue, 1982. However, respondent argues that section 707(a)(2)(B) "was intended in effect to codify the pre-existing regulations and that the line of cases following *Otey* were incorrect under then existing law." In the event we decline to overrule *Otey,* respondent alternatively argues that sale or exchange treatment is warranted if the present case is analyzed under prior precedent in this Court. In opposition, petitioners argue that we *must* overrule our decisions in *Otey* and *Park Realty* if we are to decide in favor of respondent. We agree with respondent's alternative argument.

In *Park Realty,* we stated the following in response to respondent's challenge that *Otey* was incorrectly decided:

We remain convinced that our analysis in *Otey* is correct, and while we agree that the facts in that case differ materially from those presented herein, we feel that a similar analysis is helpful in determining the tax

consequences of the transaction in issue. [*Park Realty Co. v. Commissioner*, 77 T.C. at 420.]

After considering respondent's primary argument in this case, we decline to overrule *Otey* and remain convinced that our analysis in that case is correct for property transferred before the effective date of section 707(a)(2)(B).[6]

The House, Senate, and Joint Committee reports all state in their discussion of section 707(a)(2)(B) that:

No inference regarding the tax treatment of contribution arrangements or any similar transactions under existing law should be drawn from Congress's action in adopting the disguised sale provision.

Staff of the J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 233 (J. Comm. Print); H. Rept. 98-432, at 1221 (1984); S. Print 98-169, Vol. I, at 231 (1984). Respondent paraphrases this statement to mean that "No inference can be drawn from the enactment of section 707(a)(2)(B) that prior law would not have required sale or exchange treatment." We read the above-quoted legislative history to simply mean that the adoption of section 707(a)(2)(B) *in no way* altered the law existing before the actual effective date of that section. Based upon the effective date of the statute and the legislative history, we are convinced that Congress intended for section 707(a)(2)(B) to have prospective application only. Accordingly, respondent's theory that section 707(a)(2)(B) was a mere "recodification" of preexisting law must fail.

As in *Park Realty*, we believe that the facts present in *Otey* differ materially from the facts of this case, but that a similar analysis is helpful in determining the tax consequences of the transaction in issue. Both parties have analyzed this case under six specific factors discussed by the Court in *Otey*. See *Otey v. Commissioner*, 70 T.C. at 319-321. In cases decided after *Otey*, however, we have not subscribed to a mechanical application of these "six factors." See *Barenholtz v. Commissioner, supra; Park Realty Co. v. Commissioner, supra.* Instead, we have utilized the factors as a guide in reviewing the particular facts pre-

---

[6]We express no view as to whether such an analysis is appropriate in applying sec. 707(a)(2)(B).

sented to decide whether the economic substance of the property transfers were in accord with their form. See *Park Realty Co. v. Commissioner*, 77 T.C. at 421.

In determining the substance of the transaction before us, we must thus focus upon "whether what was done, apart from the tax motive, was the thing which the statute intended." Cf. *Gregory v. Helvering*, 293 U.S. 465 (1934). Stated otherwise, "in order to fit within a particular provision of the statute a transaction must comply not only with the letter of the section, but must have a business purpose (other than to avoid taxes) that falls within its spirit as well." See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.51, p. 14-170 (5th ed. 1987). Accordingly, in order for the nonrecognition provisions of sections 721 and 731 to apply in this case, there must have been a valid business purpose (or purposes) supporting the contribution of the McDonald properties by JWC to the venture and the distribution of cash by the venture to JWC.[7]

The facts of the present case show, however, that the business purpose was for JWC to sell a 75-percent interest in the McDonald properties to Metropolitan for cash and, thereafter, for JWC and Metropolitan to contribute their 25-percent and 75-percent interests, respectively, to the venture. See *Barenholtz v. Commissioner, supra.* As in *Barenholtz*, the transaction in issue is in part a sale, but is not governed by section 707(a) because the sale occurred between partners.

Unlike *Barenholz*, the transaction in this case was structured as a contribution to capital and not a sale. However, we have stated that we will look behind the chosen form of a transaction where "elements of artificiality" are present. See *Otey v. Commissioner*, 70 T.C. at 319-320 (the first *Otey* factor). When the substance of the transaction in this case is exposed by examining its manifest business purpose,

---

[7]In the *Otey v. Commissioner*, 70 T.C. 312 (1978), affd. per curiam 634 F.2d 1046 (6th Cir. 1980), line of cases, we did not expressly state that we were applying a business purpose requirement. Nevertheless, the factors we have discussed represent facts which indicate the presence or absence of a valid business purpose. See Gross, "Post-formation Distributions From Partnerships to Partners: Characterization for Federal Income Tax Purposes," Taxes— The Tax Magazine 514, 523 (July 1982) (author extrapolated what he believes are the legal principles implied by the Court's discussions in the *Otey* line of cases as including a business purpose requirement).

it becomes clear that the transaction should be treated in part as a sale for tax purposes.

JWC had attempted to sell the McDonald properties outright for about 2 years before its transaction with Metropolitan. Petitioners contend that they abandoned their intent to sell the properties when Metropolitan came along and decided instead to form a joint venture. We find that petitioners' intent to sell at least part of the McDonald properties never wavered. All that changed, upon the advice of tax professionals, was the form in which the transaction would be cast.

We also believe that no reasonable inference can be drawn from the objective facts in this case other than that the business purpose for the transaction was to accomplish a "part sale." JWC owned 100 percent of the McDonald properties before the transaction took place. JWC transferred the McDonald properties to the venture and Metropolitan transferred cash equal to 75 percent of the net agreed value of the properties. The respective ownership percentage interests of JWC and Metropolitan under the partnership agreement, however, were 25 percent and 75 percent. Thus, JWC transferred more assets to the venture than Metropolitan in exchange for less of an ownership percentage interest. The venture immediately "distributed" all of the cash it received from Metropolitan to JWC, causing the relative value of assets contributed and the ownership percentage interests to equalize. After the "distribution," JWC had cash equal to 75 percent of the net value of the McDonald properties, and Metropolitan received a 75-percent interest in the properties through its ownership percentage interest in the venture.

We have previously described equalizing distributions as "a usual and customary partnership capitalization arrangement, under which the partner who put up a greater share of the capital than his share of the partnership profits is to receive preferential distributions to equalize capital accounts." *Otey v. Commissioner,* 70 T.C. at 321 (the fifth *Otey* factor). In the present case, however, the amount of cash Metropolitan transferred to the venture was obviously arrived at by first figuring out how much cash would then need to be distributed to equalize capital accounts (ex-

pressed at fair market value) and ownership percentage interests. Thus, the "distribution" was actually disguised consideration in the sale of part of the McDonald properties.

In *Otey*, we stated that the transaction there in issue was not an attempted end run around the limitations of section 1031[8] because, were there no partnership at all, the taxpayer could borrow funds on the security of appreciated property and apply them to his personal use without triggering gain. *Otey v. Commissioner*, 70 T.C. at 321 (the sixth *Otey* factor). We warned, however, that "Had the distributed funds come directly from the other partner, respondent's case would be stronger." *Otey v. Commissioner, supra* at 321. In the present case, respondent's case is stronger because the "distributed" funds came from Metropolitan, and not from a lender or some other third party. See *Otey v. Commissioner, supra* (funds from a lender); *Park Realty Co. v Commissioner, supra* (funds from anchor stores).

Nevertheless, petitioners argue that there was no sale because they remained liable on the two mortgages subject to which the McDonald properties were transferred. In *Otey*, we stated that the taxpayer enjoyed no guarantee that he would be paid (and be able to retain) the money distributed to him by the partnership. *Otey v. Commissioner, supra* (the fourth *Otey* factor). There was no "guarantee" because the distribution was to be paid out of funds to be borrowed by the partnership and the taxpayer was personally liable for the entire borrowing. Here, however, the mortgage debt did not give rise to the cash "distributed" to JWC. Moreover, while petitioners were ultimately liable for the mortgage debt on the McDonald properties, Metropolitan's basis in its partnership interest was increased by 75 percent of the mortgage debt. See sec. 752. Moreover, if petitioners had been required to pay the debt, they would have been entitled to a contribution from

---

[8]Sec. 1031(a)(1) provides generally that:

No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

Metropolitan of 75 percent. Accordingly, petitioners were effectively relieved of 75 percent of the mortgage debt.

The most important factor in *Otey* was that the real property "was emplaced in the partnership at its inception and as a part of the very raison d'etre of the partnership," which was the construction of housing. *Otey v. Commissioner,* 70 T.C. at 320 (the second *Otey* factor). Petitioners argue that one of the business objectives of the venture was to continue to operate the McDonald properties as they were being operated before the venture was formed. We agree, but only to the extent of the 25-percent interest we find was actually contributed by petitioners.[9]

For all of the foregoing reasons, we hold for respondent.

## II. *Investment Tax Credit Recapture*

JWC included certain tangible personal property as part of its transfer of the McDonald properties to the venture. The issue we must decide is whether and to what extent the transfer triggered investment tax credit recapture.

In general, a taxpayer must recapture investment tax credits previously allowed if any underlying property is disposed of, or otherwise ceases to be "section 38 property" (sec. 48(a)[10]) with respect to the taxpayer, before the close of the useful life taken into account in computing the amount of the credits. Sec. 47(a)(1).[11] The sale of section 38 property is a disposition which results in recapture. See sec.

---

[9]We note that the third factor in *Otey* was that the taxpayer's property was the only capital contributed to the partnership, and to treat the transaction "as an outside transaction would require us to hold in effect that no nonborrowed capital was contributed at all." *Otey v. Commissioner, supra* at 320. Since we hold that there was, in substance, a sale between the partners, followed by contributions by those partners, this factor does not apply to this case.

[10]SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property * * *

[11]SEC. 47. CERTAIN DISPOSITIONS, ETC., OF SECTION 38 PROPERTY.

(a) GENERAL RULE.—Under regulations prescribed by the Secretary—

(1) EARLY DISPOSITION, ETC.—If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property.

594

1.47-2(a)(1), Income Tax Regs. Section 47(b), however, provides in part that:

property shall not be treated as ceasing to be section 38 property with respect to the taxpayer by reason of a mere change in the form of conducting the trade or business so long as [1] the property is retained in such trade or business as section 38 property *and* [2] the taxpayer retains a substantial interest in such trade or business. [Emphasis added.]

Petitioners assumed in their argument that the Court would find that a constructive sale of the section 38 property did *not* take place. As stated above, we held that JWC constructively sold a 75-percent interest in the McDonald properties (including section 38 property) to Metropolitan. Respondent argues that there was not a mere change in the form of doing business to the extent the section 38 property was sold. The effect of respondent's argument is that JWC must recapture investment tax credits attributable to the 75-percent interest in section 38 property sold. We agree with respondent.

The regulations provide that the transfer of section 38 property will be treated as a "mere change in the form" of conducting a trade or business if all of certain specified conditions are satisfied. Sec. 1.47-3(f)(1)(i), Income Tax Regs.[12] One condition is that the basis of the section 38 property in the hands of the transferee must be determined in whole or in part by reference to the basis of such section 38 property in the hands of the transferor. Sec. 1.47-3(f)(1)(ii)(d), Income Tax Regs.

The portion of the section 38 property constructively sold from JWC to Metropolitan receives a cost basis. See sec. 1012. Thus, the basis of the property that was constructively sold would *not* be determined in whole or in part by

[12]The specific conditions set forth in sec. 1.47-3(f)(1)(ii), Income Tax Regs., are as follows:

(a) The section 38 property described in subdivision (i) of this subparagraph is retained as section 38 property in the same trade or business,

(b) The transferor (or in a case where the transferor is a partnership, estate, trust, or electing small business corporation, the partner, beneficiary, or shareholder) of such section 38 property retains a substantial interest in such trade or business,

(c) Substantially all the assets (whether or not section 38 property) necessary to operate such trade or business are transferred to the transferee to whom such section 38 property is transferred, and

(d) The basis of such section 38 property in the hands of the transferee is determined in whole or in part by reference to the basis of such section 38 property in the hands of the transferor.

reference to the basis of such section 38 property in the hands of the transferor. See sec. 1.47-3(f)(1)(ii)(d), Income Tax Regs. Accordingly, to the extent the property was sold there was not a mere change in the form of doing business and, therefore, investment tax credit recapture is appropriate.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*